# NORTHERN PACIFIC RAILWAY COMPANY *v.* BOYD.

## APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 47. Argued November 11, 12, 1912.—Decided April 28, 1913.

A corporation acquiring stock control of a railroad company and leasing it becomes liable to account to the leased company for the amount of bonds in the treasury of the leased company diverted by it; that liability can be enforced by a creditor of the leased company who is unable to collect his judgment on account of the insolvency of the leased company which has resulted from the lease itself. *Chicago Railway* v. *Chicago Bank*, 134 U. S. 277.

A lessor railroad company which has once become liable for diversion of bonds from the treasury of a lessee company remains so until the bonds are restored; nor is the obligation lessened by disbursements made on account of the roadbed of the leased company.

Improvements of a roadbed leased for 999 years from another company are expenditures for the benefit of the lessee and not the lessor; they cannot be regarded as an offset to a debt owed by the lessee to the lessor. *Chicago Railway* v. *Chicago Bank*, 134 U. S. 277.

Contracts for reorganization made between bondholders and stockholders of corporations, insolvent or financially embarrassed, involving the transfer of the corporate property to a new corporation, while proper and binding as between the parties, cannot, even where made in good faith, defeat the claim of non-assenting creditors; nor is there any difference whether the reorganization be made by contract or at private sale or consummated by a master's deed under a consent decree.

Even in the absence of fraud, any device, whether by private contract or under judicial sale, whereby stockholders are preferred to creditors, is invalid. *Louisville Trust Co.* v. *Louisville Railway*, 174 U. S. 683.

The decree in a proceeding brought by one of a class to permit that class to participate in a reorganization is not *res judicata* as against another of the same class who was not a party thereto and had no notice of the proceeding.

Rights of creditors of corporations undergoing reorganization do not

depend upon whether the property was sufficient on the day of sale to pay them and prior encumbrances, but on fixed principles established by law.

The property of a corporation, in the hands of the former owners under a new charter, is as much subject to existing liabilities as that of a defendant who buys his own property at a tax sale.

The fact that property of great value belonging to an insolvent corporation is bid in by the reorganization committee at the upset price fixed by the court at a judicial sale, cannot be used as evidence to disprove the recital as to its actual and far greater value when subsequently transferred by the reorganization committee to the new corporation.

A creditor of a corporation undergoing reorganization cannot prevent stockholders from retaining an interest in the reorganized corporation; if he is given a fair opportunity to protect his interests and refuses to avail of it he may be cut off by the decree.

Laches is not to be measured as statutory limitations are. There is no necessary estoppel from mere lapse of time where complainant's nonaction is excusable and has not damaged defendant or caused him to change his position. *Townsend* v. *Vanderwerker*, 160 U. S. 186.

In this case the delay in bringing the suit was excusable if not unavoidable; and, as complainant's silence did not mislead the stockholders and his inaction did not induce any of them to become parties to the reorganization, laches cannot be imputed to him.

177 Fed. Rep. 804, affirmed.

THE Circuit Court of Appeals for the Ninth Circuit affirmed a decree subjecting the property of the Northern Pacific Railway Company to the payment of a judgment for $71,278 which Joseph H. Boyd had revived against the Cœur D'Alene Railway and Navigation Company. The record on this appeal is very lengthy and the transactions so overlap that any chronological statement would necessarily be confusing. It will conduce to clearness to refer first to those between the Cœur D'Alene and the Northern Pacific Railroad and then set out as succinctly as possible the facts connected with the foreclosure of the Northern Pacific *Railroad* and its purchase by the Northern Pacific *Railway*.

In 1886 the Cœur D'Alene Railroad and Navigation

Company constructed a narrow gauge railroad from Burke, Idaho, on the Northern Pacific Railroad, to Old Mission. Spaulding, in 1887, brought suit in an Idaho court to recover $23,675 for work done and material furnished in building it. Owing to the inaccessibility of the county seat in which the territorial court was held, and the fact that the terms were generally devoted to criminal business, there was much delay in getting a hearing. At last there was a trial, lasting forty days; but the presiding judge died before making his findings and entering judgment. His successor having been of counsel for one of the parties, was disqualified, so that it was not until 1896 that Spaulding recovered judgment against the Cœur D'Alene. Boyd claimed that this judgment belonged to him; and, learning that Spaulding had threatened to transfer the judgment, Boyd in 1898 instituted a suit to establish his title. It terminated in his favor in May, 1901. When the appeal was dismissed, the judgment against the Cœur D'Alene was about to become dormant. Boyd thereupon (1903) began proceedings in Idaho to have it revived, and on October 23, 1905, obtained a judgment against the Cœur D'Alene Company for $71,278, being the original debt with accumulated interest and costs. An appeal was taken, which was dismissed, and thereupon Boyd, in September, 1906, brought in a state court this suit against the Northern Pacific Railroad and the Northern Pacific Railway Company, claiming that the Rail*road* was liable for this debt of the Cœur D'Alene and that the Rail*way* in turn was liable for this debt of the Rail*road*. The case was removed to the United States Circuit Court for the Eastern District of Washington.

The Cœur D'Alene Railway and Navigation Company in 1886 built a narrow gauge railroad 33 miles in length. D. C. Corbin was president and controlled 5,100 shares, which constituted a majority of the stock, which had been increased to $1,000,000, and all of which was unpaid.

In 1888, while the Spaulding suit was pending, Corbin entered into a contract with the Northern Pacific Railroad in which he agreed to sell it his stock, stated to be full paid and non-assessable; to secure for it a lease of the Cœur D'Alene's property for 999 years and authority to issue $825,000 of mortgage bonds. The Northern Pacific was to pay the interest of six per cent. on those bonds issued at the rate of $25,000 per mile on the 33 miles of road constructed, or to be constructed; and after a certain date to create and maintain a sinking fund for the redemption of the bonds at maturity; to pay for the value of material on hand, and $20,000 to cover amounts expended for surveys.

Corbin secured the adoption of resolutions authorizing the lease and the issuance of the bonds. On September 18, 1888, 5,100 shares of stock were transferred to the Railroad, which entered into possession as lessee October 1, 1888, taking charge of all the matters relating to the Cœur D'Alene, including its litigation, although Corbin and the other officers did not immediately resign.

The resolution provided for the immediate issuance of $825,000 of bonds, $360,000 of which were to be retained to redeem the outstanding bonds for that amount. The agreement was silent as to what should be done with the remaining $465,000 of bonds, and the parties are at issue as to what use was, in fact, made of them. The Railway insists that the records show that they were delivered by the mortgage trustee on October 29 and 30, 1888, upon the order of Corbin, president, part to him and part to another person. Boyd, however, contends that these bonds, $465,000, or their proceeds were used to pay Corbin for the 5,100 shares of stock sold by him to the Northern Pacific Railroad, while the latter insists that the consideration for the transfer was, as stated in the contract, the railroad's guaranteeing the principal and interest of

the bonds and taking a lease of the property for 999 years, which provided for rental to be paid out of net earnings.

The evidence on this branch of the case is meager. On behalf of the defendant the records showed that on October 29 and 30, 1888, the bonds were turned over on the order of Corbin, president of the Cœur D'Alene Company. Corbin, who was an old man at the time of taking the testimony in 1907, stated that he received none of the bonds but so much cash; that neither he nor his associates received any benefit from the mortgage, "though I presume it was probably used to pay us. I know we got our money. . . . I do not think we received any bonds, unless possibly we might have received bonds with an agreement with somebody to take them off our hands and pay us the money, because I never had any bonds. . . . If they ever came into my hands at all, they just passed through my hands."

A witness for the Northern Pacific, who had been its Auditor in 1888, had no personal knowledge of the transaction, but testified that there was nothing on the books of the Northern Pacific which showed that it had ever received the $465,000 of bonds or that it had ever paid anything for this stock. He did not think that the 33 miles of railroad cost $825,000, and supposed that the $465,000 of bonds went to Corbin and his associates. "His rights and so on were worth something."

In December, 1889, the Railroad obtained, through Corbin, the remaining 4,900 shares of stock in the Cœur D'Alene, paying therefor $250,000. It changed the road from a narrow to a broad gauge at a cost of $150,000 and extended the line 16½ miles at a cost of $750,000, and, as provided in the mortgage, issued $413,000 of additional bonds, being at the rate of $25,000 per mile. The cost of this extension, change in grade, and other betterments amounted to $910,000, or about $500,000 more than the

Northern Pacific Railroad received from the sale of this last issue of $413,000.

The first 21 months after the lease the Cœur D'Alene's net earnings amounted to $176,000, and, as the lease provided that net earnings should be paid as rental, a dividend of 6 per cent. was declared. Thereafter the earnings rapidly decreased and ultimately the books showed a loss. But the Northern Pacific Railroad, in accordance with the terms of the lease, paid the interest on the bonds until it was itself put in the hands of a Receiver in 1893. He failed to pay the interest in 1895, and proceedings were instituted to foreclose the mortgages on the Cœur D'Alene Company. The property was sold under foreclosure in January, 1899, for $220,000 to the newly organized Northern Pacific Railway Company.

This left nothing for payment of Boyd's debt, and he insists that the lease and the diversion of the funds in purchase of Corbin's stock made the Railroad responsible for the debts of the Cœur D'Alene, including his judgment. He further claims that the Rail*way* became liable for the payment of the same debt by virtue of new and independent proceedings now to be stated, under which the Northern Pacific Rail*way* in 1896 acquired the property of the Northern Pacific Rail*road*.

On August 15, 1893, Winston and others filed in the United States Court for the Eastern District of Wisconsin a creditors' bill against the Northern Pacific Railroad alleging that it was insolvent, its mortgage bonds amounting to about $140,000,000 and its floating debts to $11,000,000, and praying for the appointment of a receiver to preserve the property as an entirety and to prevent it from being dismembered by separate sales under attachments and other liens. The company owned or controlled 54 subsidiary companies, and main and branch lines 4,700 miles in length. It also owned or was entitled to receive about 40,000,000 acres under land grants. There

were six mortgages—some on one part of the property, some on another and a general mortgage on the entire railroad lines. It also owned a large body of land which was not encumbered by liens. Interest had been paid on some of the bonds, but there had been a default in the interest on those secured by the junior mortgages.

Shortly after the filing of the creditors' bill a suit was brought in the same court by the trustees to foreclose these latter mortgages. The cases were consolidated and the receivership continued under the consolidated causes. The Railroad demurred. As the road ran through several States, there were many questions of conflicting jurisdiction which were not settled until January 31, 1896, so that except for administrative orders, no steps were taken in the litigation proper.

The representatives of the stockholders intended to resist the foreclosure, and while recognizing the superior claim of the bonds, advised that "if properly protected, stockholders can secure equitable terms in any reorganization." There were also representatives of the bondholders, and ultimately the two interests agreed upon a plan, the terms of which were stated by the Reorganization Committee which, March 16, 1896, issued a circular to "the holders of bonds and stocks issued or guaranteed by the Northern Pacific Railroad." This circular outlined a plan under which all of the stocks and bonds of the Railroad were to be transferred to a new company (the present Northern Pacific Railway Company) which was to purchase the property of the Railroad, issue new bonds, part of which were to be sold to raise money with which to discharge Receivers' Certificates, purchase needed equipment and make necessary betterments. The balance was to be issued in exchange for the bonds of the old company.

The plan also contemplated the issuance of preferred and common stock, part to be used in paying debts of the subsidiary companies, for which the Northern Pacific

Railroad was liable, part for the expenses of the reorganization, and the balance to be issued in exchange for the outstanding stock of the Northern Pacific Railroad. Under the proposed plan the holder of $100 of preferred stock in the old company, upon paying $10 per share was to receive $50 of preferred and $50 of common stock in the new company. For each $100 of common stock the holder was to receive one share of common in the new corporation upon paying $15 per share. The aggregate of these cash payments on stock was about $11,000,000.

The records showing the cost of the original construction were not accessible, and in some particulars, the costs of the main and subsidiary lines appear to have been combined. But there is testimony tending to show that the cost of the railroad property, subject to the mortgage, was about $241,000,000. What was the value of the 40,000,000 acres of land is not stated. For several years prior to the receivership the road's net earnings had varied between $10,000,000 and $4,449,000. Its fixed charges amounted to $11,000,000—showing an annual deficit of about $5,000,000. The bonds, unpaid interest and Receivers' Certificates aggregated at date of sale $157,000,000. The unsecured debts proved before the master amounted to about $15,200,000. The reorganization contemplated an issue of new bonds for $190,000,000 at lower rates of interest, $75,000,000 of preferred stock, $80,000,000 of common stock—a total in bonds and stock of $345,000,000.

The reorganization agreement contained a statement that the property intended to be purchased was mutually agreed to be of the value of $345,000,000, payable in the stocks and bonds as above described.

The plan of reorganization was accepted, and on April 27, 1896, the decree of foreclosure was entered and the property ordered to be sold, on a date later fixed for July 25, 1896.

On June 23, 1896, an order was entered directing the Special Master to give notice by publication requiring each and every creditor of the Railroad to present their claims against the company or specific property before November 1, 1896; in default of which they should be excluded from the benefit of the reference. Publication was made as directed.

On July 22, 1896, Paton and others, holding contingent and unsecured claims for $5,500,000 against the Northern Pacific R. R., filed a Bill, in the same court that had jurisdiction of the Creditors' Bill and Foreclosure suit, charging that the sale was the result of a conspiracy between bondholders and stockholders to exclude general creditors, and to award to stockholders in the old company rights in the new which were valuable and could not be legally reserved for the stockholders until first offered to and declined by the general creditors. It prayed that the decree of foreclosure should be opened; that the court would formulate a just and fair plan for distribution, and that the sale be enjoined. This was later modified so as to permit the sale to proceed, but asking an injunction to prevent the distribution of the proceeds and securities. The court held that the company was insolvent; that the assets were insufficient to pay the mortgage debts; that practical operation had demonstrated that the net earnings would not pay the fixed charges; that there was no equity in the property out of which unsecured creditors could be paid and no reason existed why the stockholders could not go into a reorganization plan whereby they would become stockholders in the new company, if it should become the purchaser. The prayer for injunction was denied. No appeal was taken.

On July 25 the railroad property was sold at public outcry to the newly organized Railway Company at a price representing $61,500,000, or $86,000,000 less than the secured debts. On July 27 the sale was reported to the

court, and, and, all parties consenting, was three days later confirmed. The Railway Company entered into possession, and the first year its earnings were $489,000 above fixed charges, which had been lessened under the reorganization. The second year it declared a dividend of $3,000,000 and carried $3,000,000 to surplus. Since that time the earnings have been continually large, the business profitable and the value of the securities correspondingly great; but for a year after the sale, stock on which $10 and $15 had been paid in cash sold at prices varying from $18 to $51 for preferred and $13 and $18 for common.

In addition to the property covered by the mortgage, the Northern Pacific Railroad owned large quantities of land which were not encumbered, and in May, 1896, the Farmers' Loan and Trust Company filed its Supplemental Bill describing this unmortgaged property and alleging that various intervening creditors had obtained judgments against the Railroad Company, some of which had been assigned to the trust company. It prayed that these lands of the Railroad should be sold and the proceeds applied to the satisfaction of the unsecured claims. On the same day that this Supplemental Bill was filed, the Railroad Company and other parties to the consolidated causes answered, the court adjudged that the complainant was entitled to the decree asked for, and appointed a Receiver of the property.

It was not, however, until April 27, 1899, that the sale was ordered. The property was thereupon sold to the Northern Pacific Railway for $1,623,000. The parties stipulated that the sale should be confirmed and on the same day in September, 1899, this was done.

Out of the proceeds of this unmortgaged land a dividend of $108,000 was paid on the Cœur D'Alene bonds held by the Northern Pacific Railway. The Northern Pacific Railway had a claim against the old Railroad of $86,000,000 for deficiency between the bid at foreclosure sale and

the lien debts held by it. It had also purchased about $14,000,000 of other unsecured claims. On this $100,000,000 it was paid a dividend of $1,200,000, or a little over one per cent.

But during these years the litigation between Spaulding and the Cœur D'Alene to recover judgment for work done; between Boyd and Spaulding over the title to the judgment, and between Boyd and the Cœur D'Alene to revive the judgment had been in progress and did not terminate until 1905, when the judgment was revived. When the appeal was dismissed Boyd brought this bill in equity against the Northern Pacific Railroad Company and the Northern Pacific Railway Company, insisting that the Railroad was liable for this debt of the Cœur D'Alene and that the Rail*way* was in turn liable for this debt of the Rail*road*. There was no demurrer, but both answered and much evidence was taken. A decree in favor of Boyd and against the Railway was made a lien on the property purchased, subject, however, to the mortgages placed thereon. The decree was affirmed by the Circuit Court of Appeals (170 Fed. Rep. 779; 177 Fed. Rep. 804), and both defendants appealed. In this court a brief was filed by an *amicus curiœ*, insisting that the complainants' remedy was against stockholders of the Northern Pacific Railroad and not against the Railway Company or its property.

*Mr. Francis Lynde Stetson* and *Mr. Charles Donnelly,* with whom *Mr. Charles W. Bunn* was on the brief, for appellant:

The complainant never has been a creditor of the Northern Pacific Railroad Company, nor as against that company, has he ever possessed any rights either in law or in equity.

There never was any misappropriation of assets of the Cœur D'Alene Company by the Northern Pacific Railroad Company, but even if so, the misappropriation by one man

of the property of another does not, at the time of the mis-
appropriation, entitle the creditor of that other to pursue
the misappropriated proceeds, unless at such time such
creditor has reduced his claim to judgment, has issued ex-
ecution against his debtor upon it, and the execution has
been returned unsatisfied. *Scott* v. *Neely*, 140 U. S. 106,
113; *Cates* v. *Allen*, 149 U. S. 451, 457.

The Railroad Company never contracted to pay the
debt on which the judgment is based.

The contention that the Cœur D'Alene stock was not
paid up, and that the Railroad Company by the purchase
of that stock in 1888 became liable to the extent of the
unpaid stock subscription cannot be sustained.

The common-law rule is, that creditors of a corporation,
who deal with it in reliance upon its representation that
its authorized capital is fully paid, may if the stock has
been issued in fraud of creditors without being fully paid,
collect their debts to the extent of unpaid subscriptions
from the original subscribers to the stock or from trans-
ferees with notice.    Cook on Corporations, §§ 42, 49;
Morawetz on Corporations, §§ 821, 823; Clark & Marshall
on Corporations, §§ 791 *et seq.*

The Railroad Company cannot be held answerable as
stockholder for the debts of the Cœur D'Alene Company
because no reliance was ever placed on the stock subscrip-
tions.  Complainant has not proved that the stock was not
paid up.  He has only alleged it.

As to the contention that the Railroad Company fraud-
ulently diverted the earnings of the Cœur D'Alene prop-
erty, complainant has made no attempt anywhere to
support that charge and it may be treated as abandoned.

Even if complainant were entitled to judgment against
the Railroad Company, his rights would end there.  He
is not entitled to collect his judgment out of the property
which in 1896 passed to the Railway Company, because
the judicial proceedings, by which that property passed,

in all particulars were proper, and such as the complainants therein were entitled to pursue. Complainant's claim is based solely and simply upon the fact that as a result of the reorganization, stockholders of the old company obtained stock in the new company in consideration of cash payments. The new corporation, however, is under no obligation for debts of the old company. *Hoard* v. *Chesapeake &c. Ry.*, 123 U. S. 222; Cook on Corporations, § 80.

The transaction was as free from "fraud in law" as confessedly it was free from fraud in fact. Only by the plan adopted, or by one substantially similar, could this hopelessly insolvent property have been placed upon a sound financial basis. The reorganization of insolvent railroad properties would be an impossibility if honest, reasonable plans such as this were to be condemned, and in fact this court never has condemned them.

This branch of the defense rests on two principles, applicable in the absence of actual fraud: where nothing is taken from the general creditors, they have no valid ground of complaint; in advance of foreclosure a mortgagee may lawfully agree to sell to the mortgagor, or to anyone connected in interest with the mortgagor, a share in the property purchased, provided such sale be for a fair price and in good faith.

The mortgagee in good faith may lawfully agree to sell to the mortgagor. *Wicker* v. *Hoppock*, 6 Wall. 94, 98; *Bame* v. *Drew*, 4 Denio, 287; *Shoemaker* v. *Katz*, 74 Wisconsin, 374; *Central Trust Co.* v. *U. S. Rolling Stock Co.*, 56 Fed. Rep. 5, 7. And see opinion in the *Paton Case*, 85 Fed. Rep. 838; *The Monon Case*, 174 U. S. 674; *Wenger* v. *Railway Co.*, 114 Fed. Rep. 34; *Dickerman* v. *Northern Trust Co.*, 176 U. S. 181, 189; *Pennsylvania Transp. Co.'s Appeal*, 101 Pa. St. 576; *Kurtz* v. *Phil. & R. R. R. Co.*, 187 Pa. St. 59. See also *McArdell* v. *Olcott*, 104 App. Div. 283; aff'd 189 N. Y. 368, 393.

The only decisions in this court relied upon by complainant's counsel are *Railroad Co.* v. *Howard,* 7 Wall. 392, and *Louisville Trust Co.* v. *Louisville Ry. Co.,* 174 U. S. 674, but neither of them is decisive of the present controversy.

The points of distinction are independent of the decision against the complainant's contention pronounced in the *Paton Case.*

Treating the question broadly, it is to be remembered that between 1892 and 1900, a large number of the railroad companies of the United States, by their necessities, were forced to submit to foreclosure. They have been succeeded by a system of vigorous, solvent, prosperous and useful corporations. The change, obviously to the public advantage, was the result of reorganizations so-called, of which almost all were based upon plans similar to that involved in the present case. The principle of such plans was that financial necessities of the physical properties could be met only by sufficient and prompt provision of additional cash capital for the new corporation; and that for prompt and sufficient cash provision the most available source was and would be those who already were acquainted with the physical property and would have faith in its future possibilities. Manifestly these were, and must continue to be, those who had been interested in the old company, either as bondholders or stockholders, and not necessarily or probably those who were its general creditors.

Prior to the decree in the present suit, no court has held to be fraudulent the reorganization of an insolvent corporation under a plan which permitted interests in the new company to be acquired by stockholders of the old company only upon making substantial money payments.

There is, now, presented for review by this court, a conclusion of law never before reached by any court upon like facts. The importance of the issue to the holders of

securities of reorganized corporations cannot be over-estimated.

Even though the court should be of opinion that in this reorganization there was such participation by stock-holders as should have invalidated the proceedings in the consolidated suit, still the court having charge of those proceedings adjudged otherwise; and that judgment, sustained after consideration of the specific objections here relied on, and decreeing the Railway Company to be entitled to the property, is binding on all the world, including the complainant.

The identical objections raised by complainants, based upon this identical plan of reorganization, and urged against these identical foreclosures of the mortgages on the property of the Northern Pacific Rail*road* Company, were made and were urged by eminent counsel to the court which for nearly three years had been adminis-tering the property; that court decided them to be un-sound; and having so decided them to be unsound, it proceeded with the foreclosure and sale of the property and it rendered decrees and orders upon which we now rely. *Paton* v. *Nor. Pac. R. R. Co.*, 85 Fed. Rep. 838.

One who objects seasonably to the validity of a fore-closure sale upon the ground that the price paid was inad-equate, must accompany his objection with an offer of some responsible person to pay more. Jones on Mort-gages, § 1641; Jones on Corporate Bonds and Mortgages, § 662. It applies as well in railroad foreclosure sales as in other foreclosure sales. *Turner* v. *Indianapolis &c. Ry. Co.*, 8 Biss. 380; *S. C.*, Fed. Cas. No. 14259. Had com-plainant appeared in the court at Milwaukee and protested against the confirmation of this sale on the ground that the price paid was inadequate, the court would not have listened to his objections unless accompanied by an offer to pay more. *A fortiori* the court will not listen to them now unless there is some showing that a higher price

might have been obtained then.   Not only is there a total failure of evidence in this regard, but it is not even alleged that a higher price could have been obtained.

This very question as to the fraudulent character of the reorganization had been passed on by the court before it rendered the decrees of foreclosure and sale; its decision in the *Paton Case*, whether or not a bar, must be regarded by every other court.   *Fauntleroy* v. *Lum*, 210 U. S. 230, 237; 2 Freeman on Judgments, § 486.

Boyd was a party to the Paton proceeding in the only possible way in which he could have been one except by his own direct intervention, for not until after judgment was rendered in the foreclosure suits was he a judgment creditor even of the Cœur D'Alene Company; and not until later did he even assert himself to be a creditor of the Northern Pacific Railroad Company.   1 Daniel's Chanc. Pl. & Pr. 280, 5th Amer. ed.; Story Eq. Pl., §§ 156, 351.

The doctrine of *lis pendens* is an ancient one.   It was laid down by Lord Bacon in one of his ordinances.   *Murray* v. *Ballau*, 1 Johns. Ch. 577.   See also *Tilton* v. *Cofield*, 93 U. S. 163; *Ex parte Railroad Co.*, 95 U. S. 221; *Stout* v. *Lye*, 103 U. S. 66; *Hollins* v. *Brierfield Coal Co.*, 150 U. S. 371; *Herring* v. *Railway Co.*, 105 N. Y. 340; *Bronson* v. *Railroad Co.*, 2 Black, 524.

Complainant has been guilty of such laches as deprives him of any right now to call upon a court of equity to enforce a claim matured in 1886 and now more than quadrupled by interest charges.

This case fairly illustrates the gross injustice of permitting a suitor to assert a liability against a defendant many years after the event, when the imputation rests upon conjecture and when the lapse of time has impaired recollection of the transactions and obscured the details. Under such circumstances it has been consistently held by courts of equity, and by none more forcibly than by this

court, that the welfare of society demands the rigid enforcement of the equitable rule of diligence. *Hammond* v. *Hopkins*, 143 U. S. 224, 274; *Foster* v. *Mansfield &c. R. R.*, 146 U. S. 88, 99.

Such rule of diligence will rigidly be enforced in equity against a bondholder who fails promptly to prosecute a claim to share in the proceeds of a corporate reorganization from which he has been excluded, even though otherwise he would be entitled to relief. *Alsop* v. *Riker*, 155 U. S. 448, 459; *Felix* v. *Patrick*, 145 U. S. 317, 329.

As to the applicability of laches when the property is of a speculative character, see *Starkweather* v. *Jenner*, 216 U. S. 524; *Rothschild* v. *Memphis & Co. R. Co.*, 113 Fed. Rep. 476; *Leavenworth* v. *Chicago Ry. Co.*, 134 U. S. 688, 709; *Graham* v. *Boston, H. & E. R. R. Co.*, 118 U. S. 161.

*Mr. George Turner* and *Mr. R. L. Edmiston*, for appellee.

*Mr. Samuel W. Moore*, by leave of the court, filed a brief as *amicus curiæ*.

MR. JUSTICE LAMAR, after making the foregoing statement, delivered the opinion of the court.

Boyd's judgment against the Cœur D'Alene Railway & Navigation Company was rendered in 1896 in an action begun in 1887 in a court of the Territory of Idaho. After he had established his title to the judgment and revived it in 1906 for $71,278 there was nothing on which an execution could be levied because, in the meantime, all of the property of the Cœur D'Alene had been sold under foreclosure. He thereupon brought this suit, claiming that the Northern Pacific R. R. Co. was liable in equity as for a diversion of $465,000 of bonds, belonging to the Cœur D'Alene but used by the Northern Pacific in payment of 5,100 shares of stock bought from Corbin in 1888.

At that time the Cœur D'Alene was solvent, owning

and operating at a profit a narrow gauge railroad, 33 miles in length, constructed at a cost of about $12,000 a mile and paid for mainly out of the proceeds of $360,000 of first mortgage bonds. The original capital stock of $500,000, increased to $1,000,000, had been issued, but the subscriptions were unpaid. A majority of this stock was controlled by Corbin, the president.

On August 1, 1888, he, in his individual capacity, entered into a written contract with the Northern Pacific, in which he undertook to have the Cœur D'Alene issue $825,000 of bonds, $360,000 of which were to be retained to retire those then outstanding. He also agreed to cause the Cœur D'Alene to lease its property for 999 years to the Northern Pacific, which, in turn, was to guarantee the payment of the principal and interest of the bonds. The contract further recited that in consideration of the execution of the lease and guaranty Corbin would transfer to the Northern Pacific 5,100 fully paid and non-assessable shares of the capital stock of the Cœur D'Alene. The agreement was promptly carried into effect. A resolution was passed by the directors of the Cœur D'Alene authorizing the issue of $825,000 of bonds for properly constructing, completing and equipping the road; the 999-year lease was made and Corbin transferred his stock. Shortly afterwards the Trust Company, named in the mortgage, issued to Corbin, president, or order, $465,000 of the new bonds. They were not used for completing or equipping the road, paying the debts or other corporate purpose, and although the Northern Pacific was the then holder of a majority of the stock and in charge of the business and litigation of the Cœur D'Alene, no steps were taken to trace or recover them. Corbin testified that he was paid for the stock, in cash, about the par value of the bonds; that he had never received them, or if so, that they only passed through his hands "with an agreement that somebody was to take them off of our hands and pay us the money."

1. The buyer would naturally have been the person to make arrangement for the payment. But the Railway insists that the payment was not made in cash but that, as recited in the written contract, the stock was transferred by Corbin in consideration of the Northern Pacific guaranteeing the bonds and entering into the lease. But even if Corbin sold his 5,100 shares for a consideration nominally moving to the Cœur D'Alene, that would not change the character of the transaction if, in fact, Corbin made the transfer with the further understanding that he was to have the proceeds of the guaranteed bonds. In that event the purchaser would be as much liable for the diversion of the $465,000 as the seller. *Chicago, M. & St. P. Ry.* v. *Third Nat. Bank*, 134 U. S. 276. The terms of the contract; Corbin's control of the Cœur D'Alene; the failure to produce or account for the absence of the agent who represented the Northern Pacific Railroad in the purchase, together with Corbin's testimony that the stock was paid for out of the cash proceeds of the bonds, support the concurrent findings of the two courts that the Northern Pacific combined with him to divert $465,000 of the assets of the Cœur D'Alene. And even if, as claimed, liability for a diversion of trust funds was dependent upon the insolvency of the Cœur D'Alene, that insolvency was brought about in the very act of carrying the illegal contract into effect; for thereby the Cœur D'Alene was encumbered with a mortgage for twice its value, and the lease for 999 years, with rental payable only from net profits, left nothing out of which debts could be made by levy and sale. 134 U. S. 277.

2. Being liable for this diversion of $465,000, the Northern Pacific Railroad remained so liable until the funds were restored to the true owner. *Chicago, M. & St. P. Ry.* v. *Third Nat. Bank*, 134 U. S. 277. The obligation was not lessened by set-offs, nor discharged in whole, because the Northern Pacific spent $500,000 of its own

money in broadening the gauge, extending the line, equipping the road, or for other purposes which may have been thought by it advantageous to the Cœur D'Alene. Such disbursement was not a restoration of what had been taken, but an expenditure by the Northern Pacific, for its own benefit, in improving a road which it practically owned by virtue of the 999-year lease.

3. Although this diversion of $465,000 of bonds in 1888 made the Northern Pacific liable, in equity, for the payment of Boyd's judgment for $71,278, recovered in 1896 and revived in 1906, yet his right was apparently not enforcible because, in 1896, all of the property of the Northern Pacific Railroad had been sold under foreclosure to the newly created Northern Pacific Railway Company. He thereupon brought this suit against the mortgagor and purchaser, seeking to subject the property bought to the payment of this liability. He claimed that the foreclosure sale was void because made in pursuance of an illegal plan of reorganization, between bondholders and stockholders of the Railroad, in which, though no provision was made for the payment of unsecured creditors, the stockholders retained their interest by receiving an equal number of shares in the new Railway. There was no question as to parties and no demurrer to the bill. The Railway answered and on the trial of the merits offered evidence tending to support its contention that the decree was regular in form, free from fraud and that the property brought a fair price at public outcry. Both courts found against this contention and entered a decree making Boyd's claim a lien upon the property of the Railroad in the hands of the Railway, but subject to the mortgages placed thereon at the time of the reorganization.

The appellants attack the ruling from various standpoints based upon many facts in the voluminous record. But, having been summarized in the statement, they will not be discussed in detail, inasmuch as the case, though

presenting various aspects, is controlled by a single proposition. For although Boyd was not a party to the foreclosure, and was not made such by the publication notifying creditors to prove their claims, yet the original and supplemental decrees were free from any moral or actual fraud and were, in form and nature, sufficient to have passed a title good against him, unless the contract of reorganization, reserving a stock interest in the new company for the old shareholders, left the property still subject to the claims of non-assenting creditors of the Northern Pacific Railroad.

4. Corporations, insolvent or financially embarrassed, often find it necessary to scale their debts and readjust stock issues with an agreement to conduct the same business with the same property under a reorganization. This may be done in pursuance of a private contract between bondholders and stockholders. And though the corporate property is thereby transferred to a new company, having the same shareholders, the transaction would be binding between the parties. But, of course, such a transfer by stockholders from themselves to themselves cannot defeat the claim of a non-assenting creditor. As against him the sale is void in equity, regardless of the motive with which it was made. For if such contract reorganization was consummated in good faith and in ignorance of the existence of the creditor, yet when he appeared and established his debt the subordinate interest of the old stockholders would still be subject to his claim in the hands of the reorganized company. Cf. *San Francisco & N. P. R. R.* v. *Bee*, 48 California, 398; *Grenell* v. *Detroit Gas Co.*, 112 Michigan, 70. There is no difference in principle if the contract of reorganization, instead of being effectuated by private sale, is consummated by a master's deed under a consent decree.

5. It is argued that this is true only when there is fraud in the decree,—the appellants insisting that in all other

cases a judicial sale operates to pass a title which cuts off all claims of unsecured creditors against the property. They rely on *Wenger* v. *Chicago &c. R. R.*, 114 Fed. Rep. 34; *Farmers' Loan & Trust Co.* v. *Louisville &c. Ry. Co.*, 103 Fed. Rep. 110; *Pennsylvania Transportation Co.'s Appeal*, 101 Pa. St. 576; *Kurtz* v. *R. R.*, 187 Pa. St. 59; *Paton* v. *N. P. R. R.*, 85 Fed. Rep. 838; *Shoemaker* v. *Katz*, 74 Wisconsin, 374; *Bame* v. *Drew*, 4 Denio, 287; *Ferguson* v. *Ann Arbor R. R.*, 17 App. Div. 336; *McArdell* v. *Olcott*, 104 App. Div. 263; *S. C.*, 189 N. Y. 368, 384; *Candee* v. *Lord*, 2 N. Y. 269. Some of these cases hold directly, and others inferentially, that, in the absence of fraud, as here, a judicial sale is binding upon non-assenting creditors even though the decree was entered and the sale was made in pursuance of a contract, to which the stockholders were parties, and by which they were to retain a stock interest in the purchasing company. This makes the creditor's legal right against the shareholders' interest depend upon the motive with which they act and the method by which they carry out the scheme. If they do so by means of a private contract, though in ignorance of the existence of the creditor, the property remains liable for his debts. If they do so by means of a judicial sale under a consent decree and in like ignorance or disregard of his existence, the result is said to be different, although the shareholders should reserve exactly the same interest and deprive the creditor of exactly the same right.

Such and similar possibilities at one time caused doubts to be expressed as to whether a court could permit a foreclosure sale which left any interest to the stockholders. But it is now settled that such reorganizations are not necessarily illegal, and, as proceedings to subject the property must usually be in a court where those who ask equity must do equity, such reorganizations may even have an effect more extensive than those made without judicial sale, and bind creditors who do not accept fair

terms offered. The enormous value of corporate property
often makes it impossible for one, or a score, or a hundred
bondholders to purchase, and equally so for stockholders
to protect their interests. A combination is necessary to
secure a bidder and to prevent a sacrifice. Coöperation
being essential, there is no reason why the stockholders
should not unite with the bondholders to buy in the prop-
erty.

That was done in the present case. And while the
agreement contained no provision as to the payment of
unsecured creditors, yet the Railway Company purchased
unsecured claims aggregating $14,000,000. Whether they
were acquired because of their value, to avoid litigation,
or in recognition of the fact that such claims were superior
to the rights of stockholders, does not appear, nor is it
material. For, if purposely or unintentionally a single
creditor was not paid, or provided for in the reorganization,
he could assert his superior rights against the subordinate
interests of the old stockholders in the property transferred
to the new company. They were in the position of insol-
vent debtors who could not reserve an interest as against
creditors. Their original contribution to the capital stock
was subject to the payment of debts. The property was a
trust fund charged primarily with the payment of corpo-
rate liabilities. Any device, whether by private contract or
judicial sale under consent decree, whereby stockholders
were preferred before the creditor was invalid. Being
bound for the debts, the purchase of their property, by
their new company, for their benefit, put the stockholders
in the position of a mortgagor buying at his own sale. If
they did so in good faith and in ignorance of Boyd's claim,
they were none the less bound to recognize his superior
right in the property, when years later his contingent
claim was liquidated and established. That such a sale
would be void, even in the absence of fraud in the decree,
appears from the reasoning in *Louisville Trust Co.* v. *Louis-*

*ville Ry.,* 174 U. S. 674, 683, 684, where "assuming that foreclosure proceedings may be carried on to some extent at least in the interests and for the benefit of both mortgagee and mortgagor (that is, bondholder and stockholder)" the court said that "no such proceedings can be rightfully carried to consummation which recognize and preserve any interest in the stockholders without also recognizing and preserving the interests, not merely of the mortgagee, but of every creditor of the corporation. . . . Any arrangement of the parties by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation."

6. The Railway seeks to distinguish that case from this, insisting that even if the stockholders' participation in the reorganization would have invalidated the proceeding, such result does not follow here because the court having charge of the foreclosure passed on this very question before the sale in 1896 and dismissed the Bill of Paton, an unsecured creditor, when he made exactly the same attack upon the reorganization as that by Boyd in this bill. That court then held that as the property was insufficient to pay the mortgage debts of $157,000,000, there was nothing which could come to the unsecured creditors, and they, therefore, had no ground to complain if the bondholders were willing to give new shares to the old stockholders. No appeal was taken from that decision—possibly because the Paton claim was purchased by the Railway. But inasmuch as Boyd was not a party to the record that decree was not binding upon him as *res adjudicata*, and the opinion not being controlling authority, cannot be followed in view of the principles declared in *Chicago, R. I. & P. R. R.* v. *Howard,* 7 Wall. 392; *Louisville Trust Co.* v. *Louisville R. R.,* 174 U. S. 674.

In saying that there was nothing for unsecured creditors the argument assumes the very fact which the law con-

templated was to be tested by adversary proceeding in which it would have been to the interest of the stockholders to interpose every valid defense. If, after a trial, a sale was ordered, they were still interested in making the property bring its value, so as to leave a surplus for themselves as ultimate owners. Even after sale they could have opposed its confirmation if the bids had been chilled, or other reason existed to prevent its approval. In the present case all these tests and safeguards were withdrawn. The stockholders, who, in lawfully protecting themselves, would necessarily have protected unsecured creditors, abandoned the defense that the foreclosure suit had been prematurely brought. The law, of course, did not require them to make or insist upon that defense if it was not meritorious, nor does it condemn the decree solely because it was entered by consent. But the shareholders were not merely quiescent. They, though in effect defendants, became parties to a contract with the creditors, who were in effect complainants, by which, in consideration of stock in the new company, they transferred their shares in the Railroad to the Railway. The latter then owning the bonds of the complainant and controlling the stock in the defendant, became the representative of both parties in interest. In such a situation there was nothing to litigate, and so the demurrer to the bill was withdrawn. An answer was immediately filed admitting all the allegations of the bill. On the same day, "no one opposing," a decree of foreclosure and sale was entered. Two months later the property was sold to the agreed purchaser at the upset price named in the decree. In a few days and by consent that sale was confirmed. As between the parties and the public generally, the sale was valid. As against creditors, it was a mere form. Though the Northern Pacific Railroad was divested of the legal title, the old stockholders were still owners of the same railroad, encumbered by the same debts. The circum-

locution did not better their title against Boyd as a non-assenting creditor.  They had changed the name but not the relation.  The property in the hands of the former owners, under a new charter, was as much subject to any existing liability as that of a defendant who buys his own property at a tax sale.

The invalidity of the sale flowed from the character of the reorganization agreement regardless of the value of the property, for in cases like this, the question must be decided according to a fixed principle, not leaving the rights of the creditors to depend upon the balancing of evidence as to whether, on the day of sale the property was insufficient to pay prior encumbrances.  The facts in the present case illustrate the necessity of adhering to the rule.  The railroad cost $241,000,000. ' The lien debts were $157,000,000.  The road sold for $61,000,000 and the purchaser at once issued $190,000,000 of bonds and $155,000,000 of stock on property which, a month before, had been bought for $61,000,000.

It is insisted, however, that not only the bid at public outcry, but the specific finding in the Paton case, established that the property was worth less than the encumbrances of $157,000,000, and hence that Boyd is no worse off than if the sale had been made without the reorganization agreement.  In the last analysis, this means that he cannot complain if worthless stock in the new company was given for worthless stock in the old.  Such contention, if true in fact, would come perilously near proving that the new shares had been issued without the payment of any part of the implied stock subscriptions except the $10 and $15 assessments.  But there was an entirely different estimate of the value of the road when the reorganization contract was made.  For that agreement contained the distinct recital that the property to be purchased was agreed to be "of the full value of $345,000,000, payable in fully paid non-assessable stock and the prior

lien and general lien bonds to be executed and delivered as hereinafter provided."

The fact that at the sale, where there was no competition, the property was bid in at $61,000,000 does not disprove the truth of that recital, and the shareholders cannot now be heard to claim that this material statement was untrue and that as a fact there was no equity out of which unsecured creditors could have been paid, although there was a value which authorized the issuance of $144,000,000 fully paid stock. If the value of the road justified the issuance of stock in exchange for old shares, the creditors were entitled to the benefit of that value, whether it was present or prospective, for dividends or only for purposes of control. In either event it was a right of property out of which the creditors were entitled to be paid before the stockholders could retain it for any purpose whatever.

7. This conclusion does not, as claimed, require the impossible and make it necessary to pay an unsecured creditor in cash as a condition of stockholders retaining an interest in the reorganized company. His interest can be preserved by the issuance, on equitable terms, of income bonds or preferred stock. If he declines a fair offer he is left to protect himself as any other creditor of a judgment debtor, and, having refused to come into a just reorganization, could not thereafter be heard in a court of equity to attack it. If, however, no such tender was made and kept good he retains the right to subject the interest of the old stockholders in the property to the payment of his debt. If their interest is valueless, he gets nothing. If it be valuable, he merely subjects that which the law had originally and continuously made liable for the payment of corporate liabilities.

8. Lastly, it is said that Boyd was estopped from attacking, in 1906, a reorganization completed in 1896, and, ordinarily, such a lapse of time would prevent any creditor

from asserting a claim like that here made. For along
with the policy to encourage reorganizations, goes that of
requiring prompt action by those who claim that their
rights have been injuriously affected. The fact that
improvements are put upon the property—that the stock
and bonds of the new company almost immediately became
the subject of transactions with third persons—call for
special application of the rule of diligence. But the
doctrine of estoppel by laches is not one which can be
measured out in days and months, as though it were a
statute of limitations. For what might be inexcusable
delay in one case would not be inconsistent with diligence
in another, and unless the non-action of the complainant
operated to damage the defendant or to induce it to
change its position, there is no necessary estoppel arising
from the mere lapse of time. *Townsend* v. *Vanderworker*,
160 U. S. 171, 186.

In this case the defendants and their stockholders have
not been injured by Boyd's failure to sue. His delay was
not the result of inexcusable neglect, but in spite of
diligent effort to put himself in the position of a judgment
creditor of the Cœur D'Alene so as to be able to proceed in
equity to collect his debt. He accomplished this result
only after protracted litigation, beginning in 1887 and
continuing through the present appeal (1913). The more
important chapters of the different cases, with lawsuits
within lawsuits, are reported in 5 Idaho, 528; 6 Idaho, 97;
6 Idaho, 638; 85 Fed. Rep. 838; 93 Fed. Rep. 280; 174 U. S.
801; 170 Fed. Rep. 779; 177 Fed. Rep. 804. They involve
a series of independent transactions, in different courts,
between Spaulding and the Cœur D'Alene Company;
Boyd and Spaulding; Boyd and the Cœur D'Alene Com-
pany; the Northern Pacific Railroad and the Cœur
D'Alene, and finally the foreclosure of the Northern Pacific
Railroad and its purchase by the Northern Pacific Rail-
way.

When Spaulding recovered against the Cœur D'Alene it required years for Boyd to establish his title to the judgment. To prevent it from becoming dormant it was necessary promptly to institute proceedings against the Cœur D'Alene in the nature of *scire facias* to revive the judgment. There is no reason suggested by this record why it should have done so, unless it was to avoid the enforcement of this very claim, but the Northern Pacific Rail*way*, by its counsel, defended that revivor suit against the Cœur D'Alene, and when, in 1906, it terminated in favor of Boyd, he at once filed this bill alleging that the Rail*road* was liable for the debts of the Cœur D'Alene and the Rail*way* liable for the debts of the Rail*road*.

The delay in beginning the present suit—the last of a remarkable series of legal proceedings—was excusable if not absolutely unavoidable. Boyd claims that he had no notice of the fact that the stockholders were to retain an interest in the new company and that, in part, the delay to begin proceedings was occasioned by the Rail*way* Company itself, since it, as the purchaser of the Cœur D'Alene property, resisted his attempt to revive the judgment. Boyd's silence, in 1896, did not mislead the stockholders, nor did his non-action induce them to become parties to the reorganization plan. They have not in any way changed their position by reason of anything he did or failed to do, and the mere lapse of time under the peculiar and extraordinary circumstances of this case did not estop him, when he revived the judgment, from promptly proceeding to subject the shareholders' interest in property which in equity was liable for the payment of his debt. The decree of the Circuit Court of Appeals is

*Affirmed.*

Lurton, J., White, Ch. J., Holmes, J., Van Devanter, J., dis'nt'g.

Dissenting opinion by Mr. Justice Lurton, in which concur The Chief Justice, Mr. Justice Holmes and Mr. Justice Van Devanter.

I find myself unable to agree with the opinion of the court. The consequences which may result from the decision to the numerous reorganizations of railroad companies which occurred about the time of this reorganization or since, are, to my mind, alarming. Arrangements and agreements in advance of judicial sales between creditors interested for the common benefit are the usual incidents of foreclosures, and if fairly and openly entered into and approved by the court are not subject to criticism.

Nor do I agree that every plan of reorganization which in any way includes stockholders of the reorganized company is for that reason alone to be regarded as an illegal withholding from creditors of corporate property which should go to the payment of corporate debts. That corporate property must be applied to corporate debts before shareholders can participate, is plain. But I think every case should stand upon its own facts, and the remedy be shaped to do justice and equity in the particular case, and not tried out by any hard and fast rule such as indicated when this court says that the invalidity of a judicial sale must turn upon the character of the reorganization agreement and is not affected by actual consequences to creditors.

Here is a single creditor who comes forward many years after a judicial sale under a general creditors bill and a mortgage foreclosure bill which had been pending several years, and asserts the right to ignore the judicial sale and the title resulting and asks to have the property of the old company subjected to his non-lien claim, not because of any actual fraud in the sale, nor because he can show that he has in any way suffered a loss by reason of the plan of reorganization under which the sale was conducted, but

solely and simply because the shareholders of the debtor
company are said to have participated in some way in the
benefits of the sale. I think this goes too far and that
there is no just foundation for upsetting a judicial sale
upon the complaint of an unsecured creditor of the debtor
company in the absence of proof of fraud in the decree.
The cases supporting this view which I venture to say
should control this case are cited in the opinion of the
court. It is not a case of the transfer by stockholders of
one company to themselves as stockholders of another.
The railroad company was hopelessly insolvent. Its
annual deficit was about five million dollars. Its general
creditors, represented by the general creditors' bill, and
its mortgage creditors, represented in the mortgage fore-
closure proceeding, were endeavoring to prevent a dis-
integration and to bring the property to sale. The stock-
holders, represented by the company, were resisting. The
receivership had already lasted for several years and the
situation was growing steadily worse. The lien creditors,
to save themselves, devised a plan for the sale and pur-
chase of the property by a new company which should
assume their claims, so far as possible, and put the new
company in shape to meet its obligations. A large sum
of actual money was necessary, and also the consent of the
stockholders, to bring about a speedy sale. This money
might be in part procured by the sale of the bonds of the
new company; but if fixed charges were to be reduced, and
the deficit of the old company turned into a surplus, the
bonded debt and interest must be reduced. Therefore it
was that most of this necessary money must come from the
sale of stock. That was not a hopeful outlook. The value
of this new stock was obviously speculative. The very
basis of the plan to receive any large sum upon stock sales
was believed to depend upon making a market among the
stockholders of the old company. This was the motive
that led to the proposal that they should exchange their

LURTON, J., WHITE, Ch. J., HOLMES, J., VAN DEVANTER, J., dis'nt'g.

shares for those in the new company, paying the price stated. This actually produced about eleven of the twenty-five million dollars deemed essential to any arrangement which would save to the bondholders any large part of their debt. The price fixed turned out to be little below what the stock actually sold for on the open market for the year following the operation of the property by the purchasers. The subscription price to the shareholders, as the situation then appeared, was deemed fair, full and just by the very court which had approved the plan and decreed the sale, as is shown by the opinion of Judge Jenkins in the *Paton Case,* 85 Fed. Rep. 838.

It is true that Boyd was not a party to that suit. But it was a bill filed after the decree and before the sale, attacking the reorganization plan upon the precise grounds here advanced, and is highly persuasive as to the good faith of the plan and the fairness of the subscription price.

The upset price of sixty-one million dollars was fixed by the court,—probably as large as could be expected at the sale. As observed by this court in *Louisville Trust Co.* v. *Louisville &c. Ry.,* 174 U. S. 674, 683, "railroad mortgages, or trust deeds, are ordinarily so large in amount that on foreclosure thereof only the mortgagees, or their representatives, can be considered as probable purchasers." Hence it was that the upset price must be fixed at such a sum as was reasonably within the range of any bidding which the property might be started at by the only probable bidders. The case last cited goes to the very verge of the law, but in that case the denunciation of such a plan of reorganization goes no farther than to condemn any arrangement by which the subordinate rights of stockholders are saved at the expense of creditors. That was not done here. The sale price was about eighty million dollars less than the lien claims entitled to be paid before creditors of the class to which Boyd belongs. Many of his class were actual parties to the consolidated cause in which the reorganiza-

tion plan was approved and the sale decreed. They might have sought a larger upset price, but did not. They might have objected to the plan upon the grounds now brought forward, but they did not. They consented to the decree. They were doubtless hopeless of any sale price which could by any possibility save them, and therefore they stood aside. Technically Boyd was not a party, though under the order of the court every creditor was by publication, all along the line of the railroad, and in many States, notified to come in or be barred from participation in the proceeds. He had actual knowledge of the pending of the foreclosure proceedings, and yet took no steps to assert his rights. I do not find from the facts of this case any such diligence in his litigation against the real debtor company,—the Cœur D'Alene, and the determination of his claim to ownership of the judgment against that company in the name of Spalding as to excuse the long delay in the assertion of his rights against the railroad company or its successor, and it is not explained why he did not intervene and set up his contingent claim before the sale, or, at least, after the sale, many years before he did. I think he waited too long, and that no court of equity should upset a judicial sale after such unreasonable delay. What was said by this court in *Alsop* v. *Riker*, 155 U. S. 448, 459, 461, applies with great force to this case:

"The record discloses no element of fraud or concealment upon the part of the trustees or of any of them. What they did was done openly and was known or might have been known by the exercise of the slightest diligence upon the part of every one interested in the property of the old corporation. The plaintiff unquestionably knew, or could easily have ascertained, before the trustees bought the property at the foreclosure sale,—at any rate, before they transferred it to the new corporation,—that their purchase would be, and was, exclusively for the benefit of certificate holders interested in the trust.

Lurton, J., White, Ch. J., Holmes, J., Van Devanter, J., dis'nt'g.

Although his bonds had not then matured, he could have taken steps to prevent any transfer of the property that would impair his equitable rights in it or instituted proper judicial proceedings, of which all would be required to take notice, to have his interest in the property adjudicated.   He allowed the trust to be wound up, and postponed any appeal to a court of equity based upon an illegal breach of trust by the trustees, until six out of the seven original trustees had died."

In *Foster* v. *Mansfield &c. Rd.*, 146 U. S. 88, 99, 100, it was said:

"If a person be ignorant of his interest in a certain transaction, no negligence is imputable to him for failing to inform himself of his rights; but if he is aware of his interest, and knows that proceedings are pending the result of which may be prejudicial to such interests, he is bound to look into such proceedings so far as to see that no action is taken to his detriment."

Boyd had actual knowledge.   If he had sought to intervene, I have no doubt he would have been permitted to do so.   He chose to do nothing, and now asks a court of equity, after the purchaser has been for more than a decade in undisturbed possession and ownership, to declare the judicial sale invalid as against him.   The case is without merit, and the bill should have been dismissed.

The Chief Justice, Mr. Justice Holmes and Mr. Justice Van Devanter concur in this dissent.