LEOPOLD SAMUELS,

*vs.*

NORTHEASTERN PUBLIC SERVICE COMPANY, a corporation of the State of Delaware.

In the Matter of the Petitions of W. C. Langley, and others, Constituting a Reorganization Committee, and James T. Woodward, and others, Constituting a General Lien Committee of Northeastern Public Service Company, for Approval of a Proposed Plan of Reorganization of said Northeastern Public Service Company.

*New Castle, June* 20, 1934.

*Clarence A. Southerland,* of the firm of Ward & Gray, and *De Lano Andrews,* of the firm of Sullivan & Cromwell, of New York City, for receivers.

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, and *Deering Howe* and *George W. Sheldon,* of the firm of Shearman & Sterling, both of New York City, for Reorganization Committee.

*Francis A. Reardon,* and *Elmer W. Maher,* of New York City, for Prior Preferred Stockholders' Committee.

*Christopher L. Ward, Jr.,* of the firm of Marvel, Morford, Ward & Logan, and *H. C. Bangs,* of the firm of Chapman & Cutler, of Chicago, Ill., for General Lien Bondholders' Protective Committee.

*A. O. Dawson,* of the firm of Hines, Rearick, Dorr & Hammond, of New York City, for individual holders of general lien bonds.

*John Biggs, Jr.,* of the firm of Biggs, Biggs & Lynch, and *Franklin Benkhard,* of New York City, for Central Hanover Trust Company, trustee under General Lien Indenture.

THE CHANCELLOR: The outstanding securities of the defendant and claims against it are as follows:

First Lien and Collateral Trust Bonds, $4,670,500.
General Lien Bonds, $11,680,900.

Unsecured Claims (about) $730,000.
Prior Preferred Stock (no par) 39,820 shares.
Preferred Stock (no par) 53,188 shares.
Common Stock (no par) 49,101 shares.

The entire assets (excepting a relatively negligible amount) are pledged to secure the first lien bonds. They are pledged also to secure the general lien bonds, which are subject of course to the prior lien of the first lien bonds.

The entire assets are therefore subject to liens in the total amount of $17,081,400. The evidence, without reviewing it, shows unmistakably that the assets are worth less than the amount they are pledged to secure. There is therefore no equity in the corporation available for general creditors and of course none for any of the classes of stockholders.

The plan is assented to by Chemical Bank and Trust Company, which holds all of the first lien bonds, and has deposited the same with the reorganization committee for the purpose of the plan.

Over eighty per cent. of the $11,680,900 general lien bonds have been deposited with the committee and have thereby assented to the plan.

Of the general creditors, $243,135.71 in amount have formally deposited their claims with the committee in agreement with the plan, and the owner of $471,756 in amount is satisfied but has withdrawn its claim.

Holders of general lien bonds in the amount of $289,-400 have appeared in opposition to the plan.

The prior preferred stockholders' committee has also appeared, not exactly in opposition, but more in the role of one who asks a voluntary concession from those whose rights are prior.

I notice first the objections of the individual holders of $289,400 of the general liem bonds. It is necessary to refer to the general features of the plan in order to give the objections their proper fact setting.

The plan contemplates the acquisition by a new com-

pany of all the assets of the existing company, through foreclosure of the first lien indenture. The new company is to issue new bonds in the face amount of $6,000,000, secured by all the assets now pledged as collateral to the existing bond issues. It is to issue also 95,000 shares of no par four dollar preferred stock, and 173,362 shares of no par common stock. Based on past consolidated earnings, the new capitalization appears to be adjusted with reasonable relation to the company's earning power and reasonably calculated to afford promise of its endurance. There is provision for the issuance of additional bonds under certain restrictions. These need not be noticed, however, as they are not of any present pertinency.

The plan, as is usual in such cases, provides for the disposition of these new issues. From the viewpoint of all interests which are inferior in right to the holders of the present first lien of $4,670,500, which is in default, any plan of reorganization must satisfy that lien. The plan provides a rather complicated scheme for its satisfaction. The complication arises apparently because of the fact that no outside underwriter can be found to refund the lien and at the same time provide new money in the sum of $600,000 (subject to possible reduction) which appears to be essential for the new company's successful launching. Accordingly the underwriting is to be effectuated within the various groups of interests now existing in the company.

The holder of the first lien, the Chemical Bank, insists upon payment. It is willing to be paid off in cash at what the bonds cost it, viz., at about eighty-nine per cent of par. Thus about $4,157,275 in cash is required if payment in cash is to be made. To raise this sum and the additional $600,000 before referred to, the plan proposes to offer the new securities for sale in units as follows: fifty dollars of new bonds, and one and one-fourth shares of common stock, for forty dollars in cash. If all the units are sold, the proceeds will liquidate the present first lien and yield the cash necessary for the new company's immediate requirements.

Inasmuch as the assets are of less value than the total of the first and general lien bonds, it is obvious that the group having the first right to subscribe for the proposed units is the group composing the general lien bondholders. Accordingly they are to be allowed to subscribe for all the units if they desire. If they should do so, they would supply the cash out of which the first lien would be liquidated, and would therefore emerge as the sole owners of the assets. (Since they are to receive eight shares of the new preferred stock and two shares of new common stock for each one thousand dollars of bonds in any event, this statement is correct.) To the extent that the individual general lien bondholders do not exercise the right pro rata to subscribe, the group next in order of priority, viz., the general creditors are afforded the right, and after them the stockholders in the ranking order of their position, are accorded the right.

Thus the scheme is so devised that every individual interest in the order of its existing position is given a chance to save whatever it conceives might be worth saving by participating in its equitable turn in the underwriting benefits whatever they are. That seems to be fair.

But if the groups inferior in rank do not avail themselves of the privilege of purchasing the new units and thereby supply the funds necessary to pay off the first lienor, what then? The plan provides for that contingency. In that event, the Chemical Bank, the first lienor, itself will take the units up to the total amount thereof on the same basis as they are offered to the others, that is to say, they will take fifty dollars of the new bonds and one and one-fourth shares of common stock at forty dollars per unit. Thus they obligate themselves to take the entire issue of $6,000,000 of new bonds if necessary. Payment for the units taken by the Chemical Bank is to be made in old bonds at cost (at eighty-nine plus interest). If it should be required to take the whole issue of $6,000,000, it agrees to pay in addition to the old bonds $600,000 in cash; and

if it should be required to take less than the whole issue, its additional cash obligation is proportionally reduced.

As stated before by way of parenthesis, the holders of general lien bonds are in any event to receive eight shares of the four dollar preferred stock with a liquidation value of one hundred dollars, and two shares of common stock for each one thousand dollars of bonds held. The right to subscribe to the units is optional. Thus, the holders of the general lien bonds possess an absolute right. There is no attempt to exclude them from all participation in the assets. The right to subscribe to the units is designed to afford them the opportunity to pay off the holder of the first obligation in whole or in part.

I am unable to see wherein the proposed plan is unjust or inequitable to the general lien bondholders. It is said that if the first lien bondholder does the entire underwriting, it will get about $1,329,500 of new bonds and 150,000 shares of common stock for $600,000 in cash. This is the way that statement is worked out. The first lien bondholders will give up $4,670,000 of present bonds and $600,000 in cash, receiving therefor $6,000,000 in new bonds and common stock of 150,000 shares. Balancing the old bonds against an equivalent amount of new ones, leaves the remainder of the new ones, or $1,329,500 and the stock to be balanced against the cash of $600,000.

It is a specious line of reasoning which presents the matter in that light. It ignores the fact that a year's interest of over $250,000 is now due on the outstanding bonds, and that while the present bonds are obliged to be paid at par, it is not reasonable to give to the new bonds, which are given in exchange for the old ones and cash, a value of par unless they can be sold at that price. They cannot be sold at par. If they were offered for sale to the investing public in order to refinance this company, they would have to be offered at a considerable discount. Why then should they not be valued at a similar discount if the present first lienor buys them, as in substance it does?

When these factors are considered the statement as above put loses very much of its objectionable appearance.

But even according to the statement more of substantial merit than I am disposed to give it, it is to be observed that the general lien bondholders who press it have it in their power to pay off the first lien at a discount by absorbing the proposed units and thereby preserve to themselves exclusively the entire assets. This privilege is not contingent upon the subscription by the general lien bondholders of the total of the units. It is exercisable by all or by a part of the general lien bondholders. A reasonable minimum of subscriptions is required if the first lienor is to be denied the right to take all of the units as an entirety. That minimum being met, every individual holder of the general lien bonds is free if he chooses to participate with the first lienor in the underwriting on exactly the same basis, to the extent that his present holdings permit.

The solicitor for the objecting general lien bondholders suggested that a better plan can be devised, one that will supply funds from the outside in sufficient amount to pay off the first lien and to yield the necessary cash requirement of $600,000 for the new company. It is all very well to suggest that; but where is the lender of about $5,400,000 to be found? The objectors do not pretend to answer that question, or even suggest possible, not to say probable, places where the answer might be had. The committee representing the general lien bondholders looked hard to find an outside underwriter. The testimony shows that the field of possible lenders was rather closely gleaned. After industrious efforts in search of money elsewhere which were in vain, and which, if successful, would of course have entailed liberal underwriting charges, the committee undertook to make terms with the holder of the superior lien. The present arrangement was the result. It is more generous in its terms than the first lienor was at first willing to concede. If it be now rejected, the prospect is that the general lien bondholders will be in a far worse plight than they are.

The only thing that could possibly save them from far heavier loss would be for the court in the foreclosure proceedings to cooperate with them in a program, if such should be inaugurated, deliberately to procrastinate the foreclosure relief which the first lienor seeks, in the hope of securing greater concessions. If there were no merit in such an obstructing program, it hardly needs to be stated that the court would look with disfavor upon it. And even if delay were granted, it would mean only the postponement of the problem of the general lien bondholders. In the meantime the affairs of the company's many subsidiaries are in immediate need of attention in the way of maintenance, improvements and refinancing. Further delay in the reorganization of this company in a way that lends reasonable hope of its successful operation in the future would be highly prejudicial.

The present plan encourages the indulgence of that hope. It seems to me, under the circumstances, to be just, fair and equitable. That it is so, is the judgment of over eighty per cent. of the general lien bondholders, who are the only ones in substantial interest. Their deposits of bonds were either originally made, or later confirmed, with full details of the plan before them. I can see no good reason for me to say that their judgment of what their own welfare suggests is so far wrong that the court should denounce it. I agree with it.

2. Finally, what is the position of the prior preferred stockholders? As before indicated, the assets of this corporation are of less value than the total of the liens against them. There is therefore no equity for the stockholders. That being so, unfortunate as the result is, nothing in the way of participation can be awarded to them. *Eastern, etc., Co. v. Atlantic Public Utilities, Inc.,* 17 *Del. Ch.* 338, 156 *A.* 214. The committee representing the prior preferred stockholders asks, notwithstanding there is no equity in the assets reaching down to them, that they nevertheless be given one-fifth of a share of common stock for each

share of prior preferred stock held. I do not see on what principle an order favoring their request could be grounded. The values being insufficient to meet the general lien bonds, and general claims, any participation which the prior preferred stockholders were granted would be at the expense of general lien bondholders and other creditors who are entitled to all of the equities remaining after the first lien bonds are paid off.

It is inequitable for the court to appropriate to stockholders rights in assets which belong to creditors. *Northern Pacific Ry. v. Boyd*, 228 *U. S.* 482, 33 *S. Ct.* 554, 57 *L. Ed.* 931.

An order will be entered granting the prayers of the petition.