SOBRINOS DE EZQUIAGA, ETC., PETICIONARIOS, v. CORTE DE
DISTRITO DE SAN JUAN, DEMANDADA.

SOLICITUD para que se expida un auto de *certiorari* dirigido
.a la Corte de Distrito de San Juan, Primer Distrito, Hon.
Charles E. Foote, Juez.

No. 353.—Resuelto en febrero 23, 1923.

CORPORACIONES INSOLVENTES. — Cuando el activo de una corporación es insufi-
ciente para el pago de sus deudas, y ésta ha dejado de hacer negocios o ha
tomado o va a tomar alguna medida que prácticamente incapacita para lle-
var adelante el fin de la corporación con razonable perspectiva de éxito, o
sus inconvenientes son tales que la pronta suspensión o fracaso ha de seguir,
entonces tal corporación debe ser declarada insolvente.

ID.—*Trust Fund.*—De acuerdo con la teoría del *trust fund*, en virtud de la cual.
se considera el capital emitido en acciones y el activo de una corporación
como un fondo de depósito (*trust fund*), es evidente que una orden de la'
corte disponiendo la venta de los bienes de una ·corporación insolvente, a
petición de los principales accionistas y una mayoría de acreedores unidos
en un convenio de reorganización, es nula y no puede obligar a un acreedor
que se opuso al convenio de reorganización.

ID.—VENTA JUDICIAL NULA—PRECIO.—La venta judicial de bienes de una corpo-
ración hecha a un único licitador que ofreció pagar por los bienes rematados
acciones comunes y bonos hipotecarios, es nula por no cumplir los requisitos
que exige el artículo 1348 del Código Civil en cuanto a la forma del precio. .

Los hechos están expresados en la opinión.

Abogado de los peticionarios: Sr. *F. H. Dexter.*

Abogado de la parte contraria: Sr. *Juan de Guzmán Be-
nítez.*

EL JUEZ ASOCIADO SR. FRANCO SOTO, emitió la opinión del
tribunal.

Los peticionarios Sobrinos de Ezquiaga y la Koppel In-
dustrial Car & Equipment Company presentaron la presente
petición de *certiorari* para que revisemos los procedimientos
seguidos por el Banco Comercial de Puerto Rico contra la
Central Bayaney y anulemos y dejemos sin efecto la orden
de la corte inferior de 3 de marzo de 1922 disponiendo la
venta de todos los bienes de la demandada, así como todos los
demás procedimientos habidos en dicha corte inferior con
posterioridad a dicha orden y en virtud de la misma.

El auto fué expedido y oído el peticionario, y el Banco Territorial y Agrícola, sin que comparecieran los demás interesados, el caso ha quedado sometido a nuestra resolución.

La demanda interpuesta por el Banco Comercial de Puerto Rico alega el otorgamiento de un contrato en noviembre 18, 1920, en virtud del cual el Banco hizo un préstamo a la Central Bayaney, Inc., por cierta cantidad de dinero, cuya cantidad debía ser reembolsada en azúcares manufacturados por la Central Bayaney, reservando el banco el derecho de vender tales azúcares por cuenta de la central. El banco alegó que la Central Bayaney dejó de cumplir el contrato y que estaba en un estado parcial de insolvencia, y la súplica de su demanda, dice:

"(1) Que se dicte sentencia obligando a la corporación demandada a cumplir con todas y cada una de las condiciones del contrato de noviembre 18, 1920, y especialmente con las cláusulas segunda y sexta de dicho convenio.

"(2) Que se nombre un síndico (*receiver*) de todas las propiedades muebles e inmuebles de la citada Central Bayaney, la demandada, para que dicho síndico tome a su cargo dichas propiedades y las cuide, preserve, y administre en beneficio del demandante y de todos los acreedores de la Central Bayaney, y para que dicho síndico evite que el demandante pierda por motivo de la destrucción de los gravámenes que hoy tiene y para que determine las deudas de la demandada y las pague de acuerdo con la categoría de las mismas, y para que en general tome todas aquellas medidas usuales en casos de esta naturaleza."

Del récord resulta que en el curso de los procedimientos se presentó a la corte un convenio de reorganización entre los principales accionistas de la Central Bayaney y la mayoría de los acreedores de la misma por el cual se propuso organizar una nueva corporación con el objeto de que tomase todo el activo de dicha central, continuara sus negocios y pagara sus deudas, y la nueva corporación así formada se denominó la Arecibo Sugar Company.

El citado convenio de reorganización fué presentado a la

corte inferior para su aprobación, y dicha corte aprobó el mismo y ordenó la venta de los bienes de la Central Baya-ney el 3 de marzo de 1922, y la parte dispositiva de dicha orden, dice lo siguiente:

"Por tanto, la corte por la presente imparte su aprobación a dicho convenio tal y como ha sido modificado en todas y cada una de sus partes, quedando las partes signatarias del mismo obligadas a su más estricto cumplimiento, y en tal virtud la corte ordena que por el síndico de la Central Bayaney, Inc., se proceda inmediata-mente y sin dilación de ninguna especie a la venta de los bienes y propiedades de la Central Bayaney, Inc., los cuales constan en su in-ventario unidos a los autos.

"Dicha venta se llevará a cabo en pública subasta que se cele-brará en el edificio de esta Corte adjudicándose dichos bienes y pro-piedades al mejor postor y sujeta dicha venta a la aprobación de esta Corte. El síndico procederá inmediatamente a anunciar esta venta por medio de un edicto que se publicará en un periódico de general circulación cuatro veces consecutivas durante 15 días."

El 25 de marzo de 1922 se llevó a efecto la venta en pú-blica subasta y la "Arecibo Sugar Company" compareció por medio de su presidente haciendo a nombre de la misma, la siguiente oferta:

"La corporación Arecibo Sugar Co., Inc., formada de acuerdo y para cumplir el convenio efectuado por los acreedores de la Cen-tral Bayaney con dicha Corporación y con sus accionistas aprobado por la Corte de Distrito de San Juan, 1er. Distrito, ofrece en el acto de esta subasta adquirir todos los bienes y hacerse cargo de todas las obligaciones de dicha central por el montante exacto de sus deudas, ofreciendo en pago acciones comunes y bonos hipotecarios en la forma y proporción estipuladas en dicho convenio."

La Arecibo Sugar Company obtuvo la buena pro en vir-tud de la anterior oferta, sin haber ofrecido dinero alguno contante o en efectivo para la compra de los bienes de la Central Bayaney y la corte inferior el 30 de marzo de 1922 ordenó al Síndico otorgara escritura de venta y traspaso de todas las propiedades de dicha Central Bayaney a la Are-

cibo Sugar Company y ordenándole que rindiese cuenta de su administración.

En el curso del pleito los peticionarios con el consentimiento de la corte inferior y también del abogado del Síndico, presentaron demanda de intervención para recobrar de la Central Bayaney, o de los fondos y propiedades en posesión del Síndico ciertas cantidades de dinero que representan el valor de varias ventas de fertilizantes y materiales de ferrocarriles suministrados a la Central Bayaney.

Los peticionarios siendo entonces parte interesada, en concepto de acreedores, en el pleito iniciado por el banco contra la Central Bayaney, se opusieron al convenio de reorganización de la Central Bayaney y solicitaron la nulidad de la orden de venta de 3 de marzo de 1922 y que asimismo la corte inferior no aprobase la venta verificada mediante la subasta que tuvo lugar el 25 de marzo de 1922.

De los hechos alegados en la demanda iniciada por el banco, aparece claro que se ejercita una acción personal sobre cumplimiento específico de un contrato y que el Síndico fué nombrado con el objeto único y exclusivo de conservar los bienes de la Central demandada y pagar sus deudas. La orden disponiendo la venta de los bienes de la demandada no obedeció a la ejecución de una sentencia en cobro de dinero y dicha orden de venta no estuvo justificada ni por el carácter o naturaleza del caso ni por las cuestiones en litigio (*issues*) sometidas en la demanda.

Además una subasta pública para llevar a efecto una orden judicial de venta tenía que celebrarse en condiciones de adjudicarse los bienes ofrecidos en venta al mejor postor y ofrecerse por éste un precio cierto, en dinero, ya que por medio de la subasta lo que se verifica es simplemente un contrato de compraventa, y el comprador ha de pagar por precio de los bienes, dinero contante o signo que lo represente, según así define dicho contrato el artículo 1348 del Código Civil, que dice:

Art. 1348.—Por el contrato de compra y venta uno de los contratantes se obliga a entregar una cosa determinada y el otro a pagar por ella un precio cierto, en dinero o signo que lo represente.''

La cuestión en este punto sería determinar si la oferta del único licitador, la Arecibo Sugar Company, consistente en pagar por los bienes rematados acciones comunes y bonos hipotecarios cumple con los requisitos que exige el artículo 1348 del Código Civil citado en cuanto a la forma del precio; o en otros términos, si las obligaciones ofrecidas como precio en la subasta, pueden considerarse sino como dinero efectivo como signo que lo represente.   Entendemos que no. La intención de la ley al referirse al signo que represente el dinero, ha sido mencionar los billetes de banco, mandatos de pagos (cheques) o documentos de giro que en todos los ca-sos se traducen en la obligación de entregar dinero:

''El término, pues, de 'dinero' debemos referirlo, en su significación más restringida, al dinero amonedado, o sea al contante y rodante, como vulgarmente se dice, al metálico, en una palabra.

''Viene después el pago en papel moneda, como son los billetes al portador y los efectos de comercio, y que estos representan créditos, que deben en fecha fija convertirse en pago de numerario.'' Scaevola.   Tomo 23, pág. 296.

Por otra parte, de la demanda y de los procedimientos seguidos en la corte inferior, que aparentemente terminaron con la orden de venta y la subasta de todas las propiedades de la Central Bayaney, se desprende que dicha central se encontraba en un estado de insolvencia.

''Cuando el activo de una corporación es insuficiente para el pago de sus deudas, y ésta ha dejado de hacer negocios o ha tomado, o va a tomar alguna medida que prácticamente incapacita para llevar adelante el fin de la corporación con razonable perspectiva de éxito, o sus inconvenientes son tales que la pronta suspensión o fracaso ha de seguir, entonces tal corporación debe ser declarada insolvente.'' *Fletcher, Encyclopedia of Corporations.*   Sección 5078, nota 71.

En este extremo, la cuestión importante que se levanta

es, si en ese caso es de aplicación la doctrina del *trust fund* en virtud de la cual se considera el capital emitido en acciones y el activo de una corporación como un fondo en depósito (*trust fund*) para el beneficio de sus acreedores.    Bajo esta doctrina, si es aplicable a Puerto Rico es evidente, dado el concepto de acreedores de los peticionarios de la Central Bayaney y su oposición al convenio de reorganización de dicha central, que la orden de venta de 3 de marzo de 1922, es nula y carece de todo efecto o valor legal.

"El capital social de una compañía incorporada es un fondo separado para el pago de sus deudas.    Es un sustituto de la responsabilidad personal que subsiste en una sociedad particular.    Cuando se incurre en deudas surge un contrato con los acreedores de que no será retirado o aplicado de otro modo que no sea para sus exigencias hasta que tales exigencias sean satisfechas.    Los acreedores tienen un gravamen en él en equidad.    Si pasa a otras manos puede seguirlo en tanto pueda precisarse y someterlo al pago de sus reclamaciones salvo en cuanto a los tenedores de buena fe que lo hayan recibido mediante causa y sin aviso.    Es públicamente una garantía para aquellos que negocian con una corporación."    *Sanger* v. *Upton,* 91 U. S. 56.

"El que originó la doctrina del fondo de depósito fué el Juez Story, y la ocasión de su incorporación en la jurisprudencia de este país o su iniciación fué la resolución en el caso de Wood v. Dummer, resuelto en el año 1824.    Este fué un pleito en equidad establecido por los acreedores de una corporación bancaria para hacer responsable a los accionistas de tal corporación, resultando que la mayor parte del capital de la corporación había sido distribuída a los accionistas como dividendos, quedando por ello el banco insolvente y sin pagar a los acreedores.    El Juez Story anunció la doctrina en la siguiente forma: 'Me parece muy claro de acuerdo con los principios generales, así como con la intención legislativa, que el capital social de los bancos ha de considerarse como una prenda o fondo de depósito para el pago de las deudas contraídas por el banco.    El público, así como la legislatura, siempre han supuesto que éste es un fondo adecuado para tal fin.    Los accionistas individuales no son responsables por las deudas del banco en sus capacidades particulares.    La carta de incorporación los releva de la responsabilidad personal y sustituye en su lugar el capital social.    A este fondo se

le da crédito universalmente por el público como único medio de reintegro.   Mientras existe la corporación es la única propiedad de la corporación y puede ser aplicado sólo de acuerdo con su carta de incorporación esto es, como fondo para el pago de sus deudas, por virtud de cuya garantía pueda descontar y circular billetes. * * * '' (*Fletcher, Enc. of Cor.,* sec. 5028.)

Como expone el abogado de los peticionarios en su alegato, el caso principal de *Northern Pacific R. R. Co.* v. *Boyd,* 228 U. S. 482, sería de entera aplicación al presente y decisivo en cuanto a la nulidad de la orden .de venta.   En ese caso un acreedor no garantizado de una corporación ferro· viaria atacó como nula bajo la doctrina del *trust fund* una venta judicial de los bienes de la corporación llevada a efecto de acuerdo con un convenio de reorganización, en virtud del cual acciones y bonos de otra compañía serían emitidos a la corporación deudora en consideración del traspaso por ella de todo el activo a. la primera.

La Corte Suprema de los Estados Unidos, en ese caso declaró:

''Las corporaciones insolventes o con dificultades financieras a menudo creen necesario nivelar sus deudas y arreglar la expedición de acciones mediante convenio para seguir el mismo negocio con la misma propiedad de acuerdo con una reorganización.   Esto puede hacerse de conformidad con un contrato privado celebrado entre los tenedores de bonos y accionistas.   Y aunque la propiedad corporativa se traspasa por ello a una nueva compañía que tiene los mismos accionistas la transacción sería obligatoria entre las partes.   Pero, desde luego, que tal traspaso de los accionistas entre sí no puede anular la reclamación de un acreedor que no ha prestado su conformidad.   En cuanto a él dicha venta es nula en equidad prescindiendo del motivo con que se hizo.

*         *         *         *         *         *         *

''No existe diferencia alguna en principio si el contrato de reorganización en vez de efectuarse mediante venta particular, se consuma mediante una escritura de un síndico por virtud de una orden en la cual se ha consentido.''

Bajo este punto de vista, la corte inferior quedaba su-

jeta a la doctrina mencionada y conforme con las alegacio-
nes expuestas en la petición y sostenidas por el *return*, dicha
corte inferior no tuvo autoridad ni actuó con jurisdicción al
dictar la orden de 3 de marzo de 1922, disponiendo la venta
de los bienes de la demandada, la Central Bayaney.

Además, asumiendo que la orden de venta estaba dentro
de las facultades de la corte, los demandados prescindieron
de la regla que rige en las ventas judiciales que se hacen al
mejor postor, la que exige que debe dársele todas las opor-
tunidades al público en general para que tome parte en tales
ventas, y nada debe hacerse para suprimir la competencia e
impedir que se hagan las mejores ofertas en dinero.

Por las razones expuestas se declara nula la orden de
venta de 3 de marzo de 1922, así como todos los demás proce-
dimientos habidos en la corte inferior con posterioridad a
dicha orden y en virtud de la misma.

*Se declara nula y se revoca la orden de venta.*

Jueces concurrentes: Sres. Presidente del Toro y Aso-
ciados Wolf, Aldrey y Hutchison.