## CALVIN v. WASHINGTON PROPERTIES, Inc.

### No. 7515.

United States Court of Appeals for the District of Columbia.

Decided Feb. 17, 1941.

Rehearing Denied March 31, 1941.

---

W. Gwynn Gardiner, James M. Earnest, and Edward S. Duvall, all of Washington, D. C., for appellant.

Paul E. Lesh, of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and EDGERTON and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

Appellant Calvin sought in the trial court to enforce against appellee, Washington Properties, Inc., a judgment debt owed her by Wardman Real Estate Properties, Inc.,[1] predecessor of appellee in title to certain property. The court dismissed her complaint after hearing on the merits and gave judgment for appellee. From this action the present appeal has been taken.

The heart of appellant's contention is that appellee is merely a continuation in reorganized form of Real Estate Properties; that it was organized under a fraudulent scheme to exclude the latter's general creditors from participating in its assets while interests in the new company were retained for shareholders of the old one in violation of Northern Pacific Ry. v.

---

[1] This corporation also was made a party defendant below, but has not appealed from a judgment pro confesso against it. It is referred to in this opinion as Real Estate Properties.

Boyd, 1913, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931; that appellee in effect has participated in the breach of trust for which Real Estate Properties has been held liable; and that in consequence it should be held responsible for the judgment rendered against that company. Appellee denies these contentions and particularly that it is a reorganization of Real Estate Properties within the principle of the Boyd case. To the contrary, it asserts that all of its securities, stock as well as bonds and other obligations, were issued only to secured creditors of the old company and none to its shareholders as such. It is said also that, by filing claim upon her judgment in the foreclosure proceedings through which the property of Real Estate Properties was transferred to appellee, appellant has become a party to them, is bound by them and is estopped to deny their validity or to assert any claim against the new company. We think the position of the appellee must be sustained.

The general background for this litigation has been set out in Thomas v. Central Hanover Bank & Trust Co., 1934, 64 App. D.C. 96, 75 F.2d 227, and Thomas and O'-Connell v. Peyser and Tumulty, 73 App.D.C., —— 118 F.2d 369, decided January 6, 1941. More particularly, in 1927 appellant owned the Highlands, an apartment hotel located in Washington, subject to several large encumbrances including a second deed of trust which also covered adjoining property. For the sole purpose, she says, of "segregating" this trust, appellant conveyed the Highlands to Wardman, Hobbs and Bones, with the understanding that it would be reconveyed to her immediately on completion of refinancing. Her fatal mistake, however, was in making the conveyance absolute in form.

Wardman and his associates were engaged in promotion of large real estate enterprises and for this purpose, among others, were incorporated as Wardman Construction Company. Appellant also designated that corporation as her agent to manage the Highlands. The Wardman enterprises were involved in financial difficulties at and following the date of the conveyance of the Highlands, and sought relief by refinancing their properties through investment bankers, Hambleton & Co., of Baltimore, and Halsey, Stuart & Co., of New York. The bankers agreed to refinance the Wardman properties on the security of selected properties which were to

be conveyed to a new corporation, Real Estate Properties. In violation of their trust, Wardman and his associates caused the Highlands to be included among the properties thus conveyed.

Pursuant to the plan of refinancing, Real Estate Properties issued securities as hereinafter set forth, incuding $16,000,000 "first and refunding" bonds, secured by deed of trust on the Highlands and other properties. These bonds were taken by the bankers, principally Halsey, Stuart & Co., and later were distributed by them in large amounts to the public. Thus the lien of the bonds became perfected upon the Highlands and the other properties conveyed to secure them.

Appellant learned in 1929 of the breach of trust and in 1930 brought suit to compel reconveyance of the Highlands to her, free and clear of the new encumbrance. But in May, 1931, while her suit was pending, Real Estate Properties allowed the Highlands to be lost on foreclosure of a lien prior to that encumbrance. Thereafter appellant maintained her suit as one for damages for breach of trust. On June 1, 1933, the trial court entered an interlocutory decree holding Real Estate Properties liable, and referred the case to an auditor for accounting of rents, profits and fair market value. The accounting was completed November 1, 1935, and judgment was entered in appellant's favor for approximately $120,000.

To show the basis for her claim that appellee should be held liable for the payment of this judgment, it is necessary to set out in greater detail the plan of financing adopted in 1928 to rehabilitate the Wardman enterprises and that employed later for "reorganizing" them, when the first plan failed to produce profitable operation.

The 1928 plan provided for three corporations to carry on the activities theretofore conducted by the Wardman Construction Company. The purpose appears to have been to separate the Wardman building, brokerage and real estate business as a going concern from the ownership of the properties upon which the new financing was to be made, and also to separate both of these from the less valuable or more heavily involved assets which were likely to turn into liabilities. Accordingly, Real Estate Properties was organized and took over the selected properties from Wardman Construction Com-

pany for refinancing as stated above; a second new corporation, Wardman Realty and Construction Company, was created to take over the brokerage, construction and other business activities; and the old company was continued with its name changed to Wardman Corporation and became the parent organization in the new three-company chain.

The plan required each corporation to issue 100,000 shares of no-par stock and to employ a comptroller to be designated by the bankers. It provided that 25,000 shares in each company should be designated Class A, the remainder Class B. Class A stock was to select Class A directors, comprising one-third, Class B the other two-thirds. Presence of at least one Class A director was essential for a quorum and the comptroller could be removed only by the votes of a majority of such directors. Apparently it was intended originally that all of the Class A stock should be issued to the bankers. But as the plan was worked out the entire capital stock of Real Estate Properties was issued in one certificate to the new "intermediate" company, Wardman Realty and Construction Company. In turn the latter's stock was issued to the parent company, Wardman Corporation, but the Class A stock was made subject to a voting trust. The parent company's Class A stock was issued to the bankers, Hambleton & Co. receiving about 21% and Halsey, Stuart & Co. the remainder. The Class B stock of Wardman Corporation went to Wardman, Bones and Hobbs, who also were selected as president, vice president and treasurer, respectively, of the three companies. The bankers selected as Class A directors Leonard L. Stanley, connected with Halsey, Stuart & Co., George G. Shriver, connected with Hambleton & Co., and Thomas D. Carson. A comptroller was chosen as planned.

In addition to the $16,000,000 "first and refunding" bonds, Real Estate Properties issued $2,500,000 gold bonds, which were secured by a junior "general mortgage." The gold bonds were issued to the "intermediate" corporation,[2] Wardman Realty and Construction Co., which in turn issued its own debentures to the bankers in the amount of $2,315,000. The debentures were secured by an indenture which pledged as collateral the gold bonds issued by Real Estate Properties and all of its capital stock. The voting rights on this stock, however, were reserved to the intermediate company. A voting trust was created for the Class A stock of the intermediate company and the trustees selected were Messrs. Stephens and Clay, who were associated with counsel for Halsey, Stuart & Co., and Shriver.[3]

In the new arrangement, therefore, the bankers obtained the $16,000,000 "first and refunding" bonds, the intermediate company's debentures secured by Real Estate Properties' gold bonds and capital stock, and the Class A shares of the parent company. Wardman and his associates held the latter's Class B shares. While the bankers had a large voice in the management by virtue of their stock position, amounting in some respects to a veto power, Wardman and his associates retained the power to select two-thirds of the directors and participated actively in the management as officers. The bankers offered the first and refunding bonds and the debentures for sale to the public. They succeeded in disposing of large amounts of the former and a smaller proportion of the latter, retaining those not sold.

The new arrangement did not work out profitably. Because of this, in 1931 and apparently at the instance of the bankers, it was decided to effect a "reorganization" of Real Estate Properties, whereby its holdings would be conveyed to a new corporation. The company was in serious financial straits.[4] Hambleton & Co. owned $305,000 of the debentures and $25,000 or $30,000 of the first and refunding bonds. They were concerned also that the earnings were not supporting the bonds which

---

[2] The issue appears to have been supported, formally at least, by the transfer of the selected properties to Real Estate Properties. The plan appears to have been that the old company should convey these properties to the "intermediate" one, which in turn would convey them to Real Estate Properties.

[3] The purpose of the voting trust is said to have been to maintain continuity of voting rights in respect to the one-third of the directors which the Class A stock was entitled to elect and thus to assure the bondholders of representation on the boards of directors, "through control by the bankers of the voting trustees."

[4] Cash on hand was $59,603.41, but unsecured notes and accounts payable totalled $112,652.98, and first-mortgage interest of about $356,000 was due on March 1, with no funds to pay it. Working funds with which bills could be paid did not exceed $4,000 or $5,000. Notices

they had sold to the public. Halsey, Stuart & Co. held about $200,000 of the debentures and a much larger amount of the first and refunding bonds. A "reorganization committee," headed by Stanley, was appointed to protect the interests of the first and refunding bondholders, and another, headed by Shriver, to protect those of holders of debentures. The interests of the two groups were not identical, in fact were antagonistic because of the junior position of the debentures. Halsey, Stuart & Co. were the active promoters of the Stanley Committee, Hambleton & Co. of the Shriver Committee. Nevertheless, the two committees cooperated, entering into the "Plan and Agreement of Reorganization," dated July 22, 1931. Stanley and Shriver became "reorganization managers" to carry out the plan.

In brief, it provided for a new corporation, the present appellee, to take over the properties of Real Estate Properties and issue new securities to the holders of its first and refunding bonds and of the debentures, as well as to provide new capital. The plan contemplated transfer of the properties through foreclosure of the liens of the first and refunding bonds and of the debentures. It recited that consideration was given "primarily to the interests of the First and Refunding Bondholders," though provision was made "for junior indebtedness so far as the situation permits." Securities made eligible for participation were the first and refunding bonds, the debentures and a small amount of "two year gold notes" not materially involved in the case. Stock of Real Estate Properties was expressly excluded from participation, as were all other creditors' claims.[5] Eligible security holders were to deposit their holdings with the committees, and receive in substitution for them specified securities of the new company. First and refunding bondholders were to be given "first mortgage income bonds" with interest payable only out of "net earnings," but "cumulative" after the first two years, and also one share of common stock for each $500 principal amount of old bonds. For each $500 principal amount of debentures, the holder was to be given five shares of common stock.[6]

First and refunding bonds to the amount of $10,963,000 and $2,315,000 of the debentures were outstanding. Both of these were subject to superior liens on the properties amounting to $4,073,500. Accordingly, the plan contemplated leaving these "underlying" mortgages undisturbed and issuance of $10,963,000 of income bonds and 21,926 shares of common stock to the old company's first and refunding bondholders and 23,155 shares of common stock to the debenture holders. Thus the latter received a small majority of the stock in the new company.

The plan was carried out substantially in accord with its provisions. Eventually more than 90% of the bonds and apparently an equal or larger percentage of the debentures were deposited with the committees. Real Estate Properties permitted default to be made on its secured obligations, foreclosure proceedings were instituted, a decree of foreclosure was entered in the District Court on October 14, 1931, and receivers were appointed. These proceedings were consolidated July 24, 1931, with a general creditors' equity suit, and the receivership in the former was extended to include the latter. After numerous adjournments of the sale apparently in an effort to secure better bids, the properties were sold at auction on October 21, 1932, to representatives of the reorganization committees, who assigned the bid to the new corporation, the appellee. The price paid was $2,800,000, subject to the underlying mortgages of $4,073,500. The sale was confirmed by the court on December 1, 1932, over the opposition of intervening secured creditors, the court holding that the price was fair "under all of the circumstances" and that there was no basis for believing that a better one could be secured by further effort. On appeal this court affirmed the trial court's action, with modification of the decree to permit nondepositing secured creditors to come under the plan within an extended time.

that services would be discontinued had been served by the utilities.

[5] It was expressly provided: "The stock of the present Company will be extinguished by foreclosure or otherwise" and: "No provision is made in the Plan for any stock of the Present Company; and no stock of the Present Company may be deposited under the Plan; nor, except as herein stated, are any creditors of the Present Company entitled to participate in the Plan."

[6] A small amount of stock was allocated to be given one share for each $200 principal amount of "Two Year Notes of the Properties Company," securities junior to its gold bonds and the debentures.

Thomas v. Central Hanover Bank & Trust Co., supra.

The securities pledged for payment of the debentures, except the stock of Real Estate Properties, also were sold on foreclosure at public sale, being bought in by the Shriver Committee, which was the only bidder. The sale realized $10,000, which was applied to payment of expenses incurred by the trustee. The reason assigned for excluding the stock from the sale was that it was worthless and the stock transfer tax would merely have been burdensome.

The income bonds were issued to the persons entitled to receive them, including the bankers. The new company's stock was placed in a voting trust, three certificates being issued to the trustees, who in turn issued their trust certificates, through the reorganization committees, to the first and refunding bondholders of Real Estate Properties and the debenture holders in the proportions specified by the plan for distribution of the stock. Two of the voting trustees were named by the Stanley Committee and one by the Shriver Committee. To the extent of the securities of the old company retained by them, respectively, the bankers received voting trust certificates, but it appears that about 5000 names were on the list of bondholders and more than 600 on the list of debenture holders who received such certificates.

On June 8, 1933, appellant filed with the receivers in the consolidated foreclosure and general creditors' proceedings her interlocutory decree of June 1, 1933, referred to above. On this claim she was eventually allowed a share in the distribution of unmortgaged assets of Real Estate Properties. April 14, 1936, she filed the present suit to enforce the remainder of her judgment.

On these facts appellant asserts that the bankers effected a mere "reorganization" of the Real Estate Properties, without affecting the rights of its general creditors. She alleges that transactions involved in the "reorganization" were "part of a plan to defraud the general creditors * * * and cover up the issuance of said stock in the new company to holders of stock in the old company." The argument seems to be that because the first and refunding mortgage was foreclosed, the debentures,

being junior, became worthless, "had no value under said plans which could be asserted against the property once it was foreclosed under prior liens" and therefore the stock which was issued to their holders, including the bankers, must have been issued on account of their stock holdings in Real Estate Properties.[7] ·It is charged that the bankers dominated and controlled the three-corporation chain under the old arrangement, the entire "reorganization" proceedings, and the new corporation. Apparently it is intended to attribute this control, or its consequences, to the stock position of the bankers rather than to their creditor position. It is further set forth that the foreclosure and sale was a collusive proceeding to exclude the general creditors from participating in the corporate assets, that the default by Real Estate Properties pursuant to which the foreclosure was had was caused purposely, "notwithstanding the ... company was not insolvent and had ample funds" or credit to meet the payment; that the price paid on the foreclosure was far below the actual value of the properties sold; and that by virtue of these facts appellant is entitled to enforce her judgment against appellee.

The trial court found, in substance, that defendant is not a "reorganization" or continuation of Real Estate Properties, that the organization of defendant · was not fraudulent, that plaintiff became a party to the "reorganization" proceedings by filing her claim with the receivers and is therefore bound by the judgments and decrees therein, and that plaintiff's claim was not superior to the claims of those who received securities of defendant.

It may be admitted that the bankers, in effect, held stock in the old corporation and that they acquired stock in the new one. Likewise, that they dominated and controlled the "reorganization" proceedings both in formation and in execution of the plan. The facts recount transactions reminiscent of the heyday of finance capitalism and it may be that in some respects the plans as executed, particularly in the organization of Real Estate Properties, involved elements of fraud upon the purchasers of the securities sold by the bankers. Cf. Thomas v. Central Hanover & Trust Co., 1934, 64 App.D.C. 96, 100–101,

---

[7] Though held, formally, by the intermediate company, appellant seems to regard it as having been held, in effect, by the bankers, either through their stock interests in the parent and intermediate companies or through their alleged general domination of the entire arrangement.

75 F.2d 227. See also dissenting opinion of Mr. Justice, now Chief Justice, Groner, as to the adequacy of the bid received on the foreclosure.

It is true also that appellant has been victimized cruelly by those in whom she placed her confidence mistakenly. But these things are not to say that she is entitled to the relief she seeks here. Others have become interested in the properties from which she seeks to have recovery, who were not participants in any of the frauds, if there were such, and their interests cannot be disregarded merely because appellant has been defrauded.

■ I. The cases which hold a new corporation liable for the debts of the old do so on the ground that the new company was created by exchanging its stock for that of the predecessor, and that the exchange indicates a value in the old stock, perhaps in the nature of future earnings or control of the corporate property, which in equity belongs to creditors of the old company who have been excluded from participation in the new one. See Northern Pacific Ry. v. Boyd, 1913, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931; Central Improvement Co. v. Cambria Steel Co., 8 Cir., 1913, 210 F. 696, affirmed, Kansas City S. Ry. v. Guardian Trust Co., 1916, 240 U.S. 166, 36 S.Ct. 334, 60 L.Ed. 579. Cf. Louisville Trust Co. v. Louisville, etc., Ry., 1899, 174 U.S. 674, 683, 19 S.Ct. 827, 43 L.Ed. 1130. The basic principle is that in the distribution of corporate assets on winding up, the shareholders shall not take in priority to creditors. Accordingly, the participating shareholders are regarded as "trustees" and required to account for their interests in the new company to their "cestuis," the excluded creditors. But if the old stock is worthless because the corporate property has no present or prospective value above the encumbrances and therefore the organizers of the new company do not buy new stock with it, there is no reorganization in the sense that the new corporation is liable for the debts of the old one, merely because it has taken over the property of the latter on foreclosure.[8] "It is only where stockholders receive an interest in the new corporation for stock held in the old, that adequate provision for unsecured creditors must be made." Ballantine, Corporations (1927) 770. The same principle which prohibits the old stockholders from sharing to the exclusion of unsecured creditors (as well as independent considerations) also prevents the latter from sharing to the exclusion of or upon an equality with the secured creditors.

The peculiar fact in this case is that the bankers occupied both secured creditor and, indirectly but substantially, shareholding positions in the old company. Insofar as the bankers may be regarded as having represented the other secured creditors in holding the Class A stock, the latter may be said also to have occupied this dual status. Application of the principles stated above depends therefore on whether the issuance of the new stock is to be attributed to the one or to the other of these positions in the old company.

Appellant says it must be attributed to the stock position. The argument is made most forcibly with reference to the stock which was issued ostensibly in exchange for the debentures. As has been stated, it is that the debentures were worthless, since the first and refunding bonds were prior in lien to the debentures and the former were foreclosed upon a bid which fell far short of satisfying even the bonds. Consequently, it is said, they had no value upon which issuance of the new stock could be predicated, and therefore it must have been issued on account of the stock in the old company which was held by the bankers.

The conclusion would not follow, even if the premise were true. If the debentures were in fact worthless, as appellant contends, the stock was even more so. From the fact that those prior in lien were of no value, it does not follow that the new stock was issued on account of the inferior claims. The presumption would be the other way. Furthermore, the plan of "reorganization" expressly excluded participation by any of the stock of the old company and the trial court has found that none of the new stock was issued on account of it.

■ Appellant, however, argues that the bankers dominated and controlled the old company, the reorganization committees and proceedings, and the new company, and from this concludes that appellee must be regarded as a continuation of Real Estate Properties. Again she attributes this control, and through it the

---

[8] See the authorities discussed in Notes, 1921, 15 A.L.R. 1112, at pages 1139, 1151; 1924, 30 A.L.R. 558 at page 561; 1925, 39 A.L.R. 143, at page 146.

acquisition of the new stock, to their stockholding position in the old company. The trial court has found that there was no such domination. We think this finding is sustained by the evidence, if it is meant merely as holding that the effective control exercised by the bankers in the "reorganization" was exercised in their capacities as secured creditors and representatives of such rather than as shareholders. The bankers did not have stock control of the old corporation. All that they held directly in voting power was the Class A stock of the parent corporation. Assuming also that they controlled the trustees who held the voting power on the intermediate company's Class A stock, despite evidence to the contrary, neither power was sufficient to give them control either of the parent or of the intermediate company, or through them of Real Estate Properties. The Class A stock was minority stock, constituting only one-third of the voting power. Though it could veto some things, it could not bring about affirmative action such as was necessary for reorganization. Had Real Estate Properties turned out prosperously, so that creditors could not have intervened, the bankers, through the voting power which they had by virtue of their stock position or controlled through the voting trust, could not have brought about the reorganization. It was only because the company's earnings were insufficient to pay its fixed charges and operating expenses that the bankers were enabled to put into operation the creditor control of foreclosure and through it the plan of "reorganization." It was carried through, therefore, not by virtue of any stock control or participation, but as a result of rights acquired as creditors. Acquisition of the new stock, in consequence, must be attributed to the creditor position, not to that as shareholders, of the bankers and those whom they represented, so far as control is concerned.

■ II. But even creditors cannot exercise their controls so as to give to shareholders interests which should go to other creditors. And appellant seems to contend that by exercising their power, whether as creditors or as shareholders, the bankers acquired stock interests for themselves and other debenture holders in excess of what they were entitled to receive on account of the debentures, and that this was fraudulent as to her. We think this presents the crucial issue. If, through their control as creditors, the bankers acquired interests which should have gone to the general creditors, appellant is entitled to relief. If, however, they merely acquired interests which should have gone to other secured creditors, appellant has no cause for complaint. The question is whether she has been defrauded, not whether someone else may have been.

The trial court found that there was no fraud or collusion in the transaction whereby the new corporation took over the assets of the old. The finding is supported by substantial evidence. The only evidence which appellant marshals to support the contention that she has been defrauded in the "reorganization" is that of the alleged domination by the bankers of the old corporation and of the "reorganization," and the inference which she says should be drawn that the bankers utilized their position of dominance to obtain for themselves a disproportionate share in the stock of the new corporation at the expense of the general creditors. Even if the allegation of control is accepted as true, it is susceptible equally of the inference that the bankers used their power to the detriment of the other *secured* creditors by obtaining a disproportionate share of a fund in which *unsecured* creditors were not entitled to participate.[9] Appellant must fail if it appears either (1) that the bankers did not exercise power unlawfully to obtain a preference, or (2) that any preference which appellee might have obtained was against other secured creditors, not appellant. Appellant's evidence obviously is designed to show that a majority of the stock in the new corporation would not have been given to those who held only secondary securities of Real Estate Properties, while the holders of the first mortgage bonds received only the minority, unless pressure had been exerted by the bankers. As against this, it is to be recalled that the old bondholders received income bonds in addition to the stock which was allocated to them. Furthermore, the contention does not tend in any way to show that *general* creditors were entitled to any stock, or other participation in the assets, the clear inference being rather that the first mortgage bondholders were entitled to a majority of the stock. As appellee points out, if the bankers' debentures were

---

[9] This possible inference was considered and rejected in the proceedings culminating in Thomas v. Central Hanover Bank & Trust Co., 1934, 64 App.D.C. 96, 75 F.2d 227.

worthless and therefore constituted no suitable basis for the issuance of new stock, appellant's claim was "worse than worthless. The debentures were secured by pledge of the general or second mortgage bond which was bought in by the debenture holders' committee. The debt to appellant was wholly unsecured."

To sustain the charge of fraud, emphasis is placed upon the alleged inadequacy of the price paid on the foreclosure sale for the properties and evidence which was presented to show that they were worth much more. Admittedly the price was far below the amount of the mortgage indebtedness and appraisals which were made when Real Estate Properties was organized and afterward. The total price was $6,873,500, or $2,800,000 in excess of the "underlying" mortgages, subject to which the property was sold. The mortgage indebtedness amounted to over $19,500,000. Hobbs testified for appellant that the property was worth $20,660,312, but his appraisal was based on original cost less depreciation or reproduction cost, which clearly might not reflect the actual fair value or any obtainable value of the property in 1932, when values and especially those of hotel properties had crashed to the bottom. Other appraisals were referred to in the testimony, but they were obviously hearsay and were recognized by the trial court as such.

Either Hobbs' appraisal was discounted by the trial court or it was thought not to show such an excess of value over the mortgage indebtedness as to indicate fraud in the "reorganization" plan. Furthermore, the adequacy of the price under the conditions existing in 1932, when the sale occurred, was contested when the matter of confirming the sale came before the court. Holders of undeposited first and refunding bonds opposed the confirmation and sought to have the sale set aside. Though they were only four and held less than one per cent of the outstanding bonds, the opposition was vigorous and sustained. Over it the trial court confirmed the sale. It was fully informed concerning the plan, its execution and the terms of the sale. It found that the sale was fairly conducted and that there was nothing to show fraud in any way on the part of the bondholders' committee. The court, it is true, expressed regret that the price did not "bear a better relation to the assessed value and the market value, as testified to by various witnesses." But it pointed out that after several postponements no other bidders had come forward, that prices were greatly depressed and that "nothing in the evidence gives hope for a better price if the bid is rejected." Consequently it concluded that the sale should be confirmed. As has been stated, this action was affirmed by this court on appeal. Although appellant was not a party to the suit, its outcome was a conclusive adjudication that the nondepositing secured creditors had not been defrauded. The record shows that the allegations, and therefore presumably the evidence, as to inadequacy of the price were substantially identical with the evidence presented below. The same considerations which sustained the court's findings in this respect on the confirmation go to sustain the similar findings made below. We cannot say that the trial court was wrong in not concluding that the secured creditors unlawfully obtained a preference at the expense of the general creditors.

■ As to the contention that the appellee participated in the breach of trust for which Real Estate Properties was held liable, if by this is meant anything more than to repeat that appellee is a mere "reorganization" of that company, it is clear that the Highlands property was lost by foreclosure before the new corporation took over the other property, the foreclosure being in May, 1931, and the other property being bid in for appellee October 21, 1932. Appellant's property was gone even before adoption of the "reorganization plan." In view of what has been said already about the "reorganization" and the further fact that appellee could have received or accepted no benefit from the breach of trust by Real Estate Properties[10] since no part of appellant's property or its proceeds went to appellee, it is impossible to hold that appellee took part in the breach of trust.

Since what has been said disposes of the case, it is unnecessary to decide whether under the circumstances presented appellant is bound, through filing her claim with the receivers, by the adjudications in the "reorganization" proceedings, or is estopped by her conduct to claim further compensation out of the former assets of her debtor.

The judgment is affirmed.

[10] Cf. Spadra-Clarksville Coal Co. v. Kansas Zinc Co., 1915, 93 Kan. 638, 145 P. 571, Ann.Cas.1916D, 652.