JOHN R. GIBSON, Circuit Judge,
dissenting.
The district court found that Ahlers’ liabilities exceed his assets by “a substantial margin,” that he “could not * * * be expected to operate profitably,” and that his reorganization plan was “utterly unfeasible.” Ante, at 399. Despite these findings of fact, the court today devises a plan of its own to save Ahlers from liquidation. To do so, the court ignores factual and equitable considerations properly relied upon by the bankruptcy judge in ordering the commencement of adequate protection payments, evades its duty to review expert valuations under the clearly erroneous standard and to refrain from finding facts nowhere in the record, and adopts a view of the absolute priority rule contrary to precedent, logic, and fairness. Understandably sympathetic in the face of admittedly acute difficulties gripping the nation’s entire farm economy, the court unabashedly legislates a result which undermines reasonable commercial expectations, and substantially reorders the risks of insolvency borne by farm debtors and their bankers. I respectfully dissent.
I.
I first take issue with the court’s conclusion that the bankruptcy court erred in not granting Ahlers a one year and six week delay in commencing adequate protection payments. 11 U.S.C. § 362(d) (1982) requires the bankruptcy court to grant secured creditors relief from the automatic stay for cause, including the lack of adequate protection. Congress intended that the bankruptcy court, in determining the scope of adequate protection payments, should as nearly as possible provide the secured creditor with its bargained-for rights. In re Briggs Transportation Co., 780 F.2d 1339, 1346 (8th Cir.1985). We have recognized that the bankruptcy court may order adequate protection payments for reinvestment value lost during post-petition foreclosure delay. Id. at 1350.
Congress intended that the bankruptcy court exercise considerable discretion in arriving at adequate protection findings. See In re Martin, 761 F.2d 472, 476 (8th Cir.1985). As has been long and repeatedly recognized, the bankruptcy court is a court of equity. Pepper v. Litton, 308 U.S. 295, 303-04, 60 S.Ct. 238, 243-44, 84 L.Ed. 281 (1939); In re Stevenson Associates, Inc., 777 F.2d 415, 419 (8th Cir.1985). To achieve an equitable result, the bankruptcy court must be left free to take a case-by-case approach to varying fact situations. See In re Briggs, 780 F.2d at 1346-47. Therefore, “final reconstruction of the creditor’s bargain to determine just what interests of the creditor should be afforded protection during the pendency of the automatic stay is a balancing act best left to the discretion of the bankruptcy judge.” Id. at 1349.
Despite the congressional mandate to defer to the bankruptcy court’s discretionary authority, and without making any effort to assess the equitable concerns which the bankruptcy court may have weighed in ordering the commencement of adequate protection payments, the court today renders nugatory, as a matter of law, the banks’ bargained-for right to investment return on foreclosure proceeds during the one year and six week period following imposition of the automatic stay. The court achieves this reversal of the bankruptcy court’s adequate protection finding by taking judicial notice of “reasonable and established marketing techniques,” ante, at 397, which it asserts Minnesota lenders employ to accommodate the state notice and redemption provisions. The court, however, fails to acknowledge the host of other equitable concerns that the bankruptcy court was required to consider in reaching its determination. Similarly, it fails to review the bankruptcy court’s findings under the clearly erroneous standard. Rather, the court simply disregards these constraints essential to the proper exercise of appellate jurisdiction in an effort to bolster Ahlers’ chances of forging a feasible plan for reorganization.
Recognizing the special fact-finding and equitable powers of the bankruptcy court, this court held in both In re Briggs and In *405 re Martin that adequate protection is a case-by-case inquiry subject to clearly erroneous review. Under these cases, and under the circumstances presented by this case, I cannot say that the bankruptcy court, in its proper exercise of fact-finding and equitable jurisdiction, was clearly erroneous in finding the banks entitled, without delay, to protective payments on the reinvestment value of the foreclosure proceeds.
II.
The court today also concludes that the district court erred in holding that Ahlers’ reorganization is unfeasible. The court reaches this result by replacing the district court’s findings as to the values of Ahlers’ land and equipment with findings of its own. I differ with the court’s method and with its implicit conclusion that the district court’s valuations were clearly erroneous.
Fed.R.Civ.P. 52(a) orders that findings of fact shall not be set aside unless clearly erroneous. As the Supreme Court explained in Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), if a finding of fact is based on the testimony of one of two or more witnesses, each of whom has told a plausible and coherent story not contradicted by extrinsic evidence, that finding can virtually never be clear error. Id., 105 S.Ct. at 1513. Similarly, where there are two permissible views of the evidence, the trial court’s choice between them cannot be clearly erroneous. Id. at 1512. In light of the teaching of Anderson v. City of Bessemer City, I cannot conclude that the bankruptcy court’s findings on the values of Ahlers’ land and equipment, confirmed by the district court, were clearly erroneous.
Dennis Christensen, a farm manager and real estate appraiser, testified that his assessments were based on land values as of January 15, 1985, approximately six weeks after Ahlers filed under Chapter 11. He testified that he considered land sales in the county immediately west of Nobles County which had taken place within the previous three weeks. He testified that his soil comparisons indicated close similarity between those parcels and Ahlers’ parcels. He also based his assessments on conversations with the local assessment official, and with local bankers and lawyers familiar with the local real estate market. He stated that his valuations took into account the reported approximately 24 percent decline in 1984 in the value of good com and soybean ground in southern Minnesota. Similarly, Arden Harberts, a professional auctioneer who stated that he holds about 60 farm auction sales a year, testified to the value of Ahlers’ farm machinery and equipment. Harberts testified that his valuation was based on his experience and knowledge of the current market.
It is true that Christensen’s and Har-berts’ valuations differed widely from those offered by Ahlers. However, the bankruptcy court accepted the testimony of the banks’ witnesses. As the bankruptcy court stated: “Mr. Ahlers provided testimony regarding the valuation of the machinery and equipment, candidly stating that his valuation was based on conjecture. Norwest’s evidence was by expert testimony based on substantial foundation.” Slip op. at 8. The bankruptcy court offered a similar assessment of the land valuation testimony. Slip op. at 6 n. 6. In my judgment, the evidence was sufficient to support the findings made by the bankruptcy court. I could not, under the standard articulated in Anderson v. City of Bessemer City, hold these findings clearly erroneous.
The district court accepted the bankruptcy court’s findings that the valuations offered by the banks’ experts were accurate. The majority quarrels with the district court’s adoption of these findings, contending that because land prices had fallen since the adequate protection hearing, section 506(a) of the Bankruptcy Code, 11 U.S.C. § 506(a) (1982), requires the district court to revalue Ahlers’ parcels. The logic of this argument escapes me. First, nowhere in the record made before the district court is there evidence of a precipitous decline in land values during the period between the adequate protection and confirmation hearings. Second, even if such a decline occurred, the consequences of the court’s determination that the land must be revalued are nonetheless dramatic. Under section 506(a), the banks’ claims are secured only to the extent of the value of the collateral at the time the plan is confirmed. *406 The court's ruling thus places the loss resulting from the asserted drop in farm land values during the pendency of the automatic stay entirely on the banks. The House Report which the court cites falls far short of supporting its assertion that Congress intended such a dramatic shift in the risk of loss. Nor do I believe such a shift is either reasonable or fair. For during the stay period, the banks were utterly without recourse. Thus, I cannot say that the district court acted improperly in adopting the bankruptcy court’s findings.
In selecting valuation figures even lower than the estimates given by Ahlers, as is suggested in the Appendix, the court today ignores the plausible and coherent testimony in the record that would support the bankruptcy court’s findings, which the district court adopted. Instead, the court simply substitutes wholesale findings of fact of its own. It makes no effort to analyze the accepted testimony, as required by Anderson v. City of Bessemer City. The court’s action is especially ironic in light of the bankruptcy court’s findings that even were it to accept Ahlers’ valuations, it still would conclude that the banks would be substantially undersecured. The irony is heightened when the court orders that should the farming operation produce profits above those projected, these should be distributed to the unsecured creditors. This is little more than contemplating the distribution of a mirage.
Under the principles of Anderson v. City of Bessemer City, I would conclude that the findings made by the bankruptcy court and confirmed by the district court were not clearly erroneous.
III.
The court also decides today that “experience, knowledge, and labor,” ante, at 392, is the equivalent of capital. It thus would allow Ahlers to force upon the impaired unsecured creditors a reorganization plan which would permit Ahlers to participate in the plan on the strength of his promise to later contribute his expertise and efforts to the plan. This reasoning works an expansion of the rule of absolute priority that is unprecedented, illogical, and unfair.
The absolute priority rule, established in Northern Pacific Railway Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913), and codified at 11 U.S.C. § 1129(b)(2)(B)(ii) (West Supp.1986), prohibits a debtor from participating in a reorganization plan unless unsecured creditors’ claims are fully satisfied. The rule assures that the plan is fair and equitable by protecting unsecured creditors from suffering losses greater than they reasonably could have foreseen. Case law has developed a narrow corollary to the absolute priority rule. Where substantial fresh capital, or its equivalent, is essential to the success of a plan, the debtor may, over the objection of impaired unsecured creditors, make such fresh contributions and participate in the plan to the extent of the contributions. This corollary recognizes that a reorganized going concern generally is worth more than its liquidated assets. If reorganization requires debtor participation, and if the impaired creditors suffer no net loss by virtue of the debtor’s concomitant contribution, otherwise lost value is captured without violating the fair and equitable requirement.
The Supreme Court recognized this corollary to the absolute priority rule in Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). There, however, the Court held that a reorganization plan of an insolvent corporation was not “fair and equitable” because it preserved shareholders’ interests without any fresh contribution of capital by such shareholders and without full satisfaction of creditors’ claims. Despite this holding, the court seizes upon dicta in Los Angeles Lumber, that “the stockholder’s participation must be based on money or money’s worth,” id. at 122, 60 S.Ct. at 10, to conclude that “[c]ertainly a farmer’s efforts * * * [are] measurable in money or money’s worth,” and thus may be used to override the dissent of legitimate creditors to Ahlers’ retention of an interest in the reorganization plan. Indeed, even the observation in Los Angeles Lumber dealt not with an exchange of a promise to make future contributions of labor and skill for equity participation in a reorganization plan, but with an offer by shareholders in a corporation to make immediate and substantial contributions of new and needed capital. These distinctions, I believe, render the court’s reliance on the “money’s worth” dicta unsound.
*407 The Court in Los Angeles Lumber suggested that when a cash contribution is impossible, “ ‘a [creditor’s] interest can be preserved by the issuance, on equitable terms, of income bonds or preferred stock,’ ” id. at 117, 60 S.Ct. at 8 (quoting Boyd, 228 U.S. at 508, 33 S.Ct. at 561), or “ ‘through other arrangements which distinctly recognize their equitable right to be preferred to stockholders against the full value of all property belonging to the debt- or corporation,’ ” id. (quoting Kansas City Terminal Railway Co. v. Central Union Trust Co., 271 U.S. 445, 454-55, 46 S.Ct. 549, 551-52, 70 L.Ed. 1028 (1926)). These examples of permissible cash substitutes, undoubtedly what was intended by the “money’s worth” phrase, are distinctly capital in nature. But in rejecting a plan similar to that hypothesized today, the Court made clear that non-capital contributions, such as
financial standing and influence in the community [which] can provide a continuity of management constitute^] no legal justification for issuance of new stock to [the debtor]. Such items are illustrative of a host of intangibles which, if recognized as adequate consideration for issuance of stock to valueless junior interests, would serve as easy evasions of the principle of full or absolute priority * *.
Id., 308 U.S. at 122, 60 S.Ct. at 10. The Court continued:
Such items * * * have no place in the assets column of the balance sheet of the new company. They reflect merely vague hopes or possibilities. As such, they cannot be the basis for issuance of stock to otherwise valueless interests.
Id. at 122-23, 60 S.Ct. at 10-11 (footnotes omitted). Like Los Angeles Lumber, every case the court cites to support the exchange of labor for equity participation deals with a proposed capital contribution. To my knowledge, the court today writes the first labor contribution case. The court’s expansion of the narrow corollary to the rule of absolute priority, therefore, is supported neither by Los Angeles Lumber nor by any other precedent.
The analysis in Los Angeles Lumber also highlights the extreme illogic of the analogy from capital contributions to contributions of labor and expertise. First, capital, not labor, is the means of exchange in our economy. Labor cannot easily be turned to another use; it is not liquid. Therefore, a contribution of labor does not provide the same certain protection to the unsecured creditor as does one of capital. Second, while the value of capital is fixed, the value of a farmer’s experience, knowledge, and labor to a failing farm, like the value of “financial standing and influence in the community,” Los Angeles Lumber, 308 U.S. at 122, 60 S.Ct. at 10, is a matter of grave speculation, again injecting uncertainty into the bargain. Finally, the capital contribution is executed prior to plan approval. Here, it is only upon the promise of future contributions of labor that creditors must rely for protection. How are we to bind the debtor to an agreement to contribute labor? Surely the court does not suggest that we are empowered to order specific performance of labor obligations. See Karrick v. Hannaman, 168 U.S. 328, 335-36, 18 S.Ct. 135, 138-39, 42 L.Ed. 484 (1897). Does not a plan involving a contribution hypothesized by the court “reflect purely vague hopes or possibilities,” id., 308 U.S. at 123, 60 S.Ct. at 11, rather than the certainty a finding of feasibility requires?
These distinctions render expansion of the capital contribution corollary to the absolute priority rule not only illogical, but also violative of the “fair and equitable” requirement. Just as an unsecured creditor obviously must foresee the possibility of the debtor’s insolvency and subsequent reorganization, so too may he fairly expect that if insolvency occurs, his recovery will not be impaired by the debtor’s retention of an interest in the plan. Because an agreement to contribute labor cannot be sufficient to justify participation, a plan including such a contribution is not “fair and equitable.”
I do not believe the section 1129(b)(2)(B)(ii) rule of absolute priority would permit Ahlers to participate in the reorganization plan on the strength of his promise to contribute his “experience, knowledge, and labor” to the plan. Therefore, I would affirm the district court’s ruling that the plan was unfeasible.
*408 IV.
The motivation behind the court’s decision is commendable. Farm bankruptcies have reached epidemic proportions and farmers are being torn from their livelihood. Nonetheless, I cannot abide the solution the court today proposes. As the court acknowledges, the district court found that Ahlers’ plan for reorganization was “utterly unfeasible” because his “current liabilities exceeded current assets by a substantial margin” and because he “could not * * * be expected to operate profitably.” Ante, at 18. It is only through the court’s disregard of its proper role that it can coax from the record, and from sources outside the record, its conclusion that a razor thin margin might exist by which Ahlers could feasibly reorganize. If there is to be an adjustment to the relationship between the farmer and the farmer’s bank, serious policy questions are presented which can best be considered by the Congress. We, however, are advised to confine our efforts to deciding cases on the law as written and on the facts as found.
I respectfully dissent.
APPENDIX I
The values of the land, equipment, and production costs represented in this Appendix were derived by this Court from the best available evidence in the record presented to it, and from published studies by the University of Minnesota. The commodity prices were based upon recent cash grain prices at the Fulda, Minnesota, Independent Cooperative grain elevator. The sole purpose of this Appendix is to illustrate that, based upon the record before this Court, the Ahlers may be able to present a feasible reorganization plan. We emphasize, however, that this plan, as well as the values contained therein, is merely illustrative, and is not binding on the parties or the bankruptcy court. On remand, the bankruptcy court is free to determine these values as of the date of the confirmation hearing in light of the reorganization plan submitted by the Ahlers to determine if that plan is feasible.
I. AHLERS' INCOME
A. 830 Tillable Acres
550 owned by Ahlers
280 rented by Ahlers
Rental agreement is a standard 40%/60% share crop payable before expenses.
B. By participating in the recently enacted federal farm program, the Ahlers’ projected income for 1986 would be as follows:
1. Com (332 acres)
a. 415 acre base
20% removed from production
110 bu./acre yield and base
415 acres x (80%) = 332 acres
332 acres x 110 bu./acre = 36,520 bu.
36,520 bu. x $3.50/bu.[1] = $ 127,820
*409 b. Expenses
(1) Share Crop (60/40)
95 rented acres in corn
95 acres x 110 bu./acre = 10,450 bu.
10,450 bu. x (40%) = 4,180 bu.
4,180 bu. x $3.50 = $( 14,630)
(2) Production
(a) Seed = $ ( 8,250)
(b) Fertilizer = $ ( 9,000)
(c) Herbicide = $ ( 3,306)
(3) Insurance
(a) Federal Crop 332 acres x $10.75/acre = $ ( 3,570)
c. Total Subnet on Corn = $ i,064
2. Soybeans (375 acres)
a. Anticipated Yield = 35 bu./acre
375 acres x 35 bu./acre = 13,125 bu.
b. Present Price = $5.07/bu.
13,125 bu. x $5.07/bu. = $ 66,544
c. Expenses
(1) Share Crop (60/40)
135 rented acres in soybeans
135 acres x 35 bu./acre = 4,725 bu.
4,725 bu. x (40%) = 1,890 bu.
1,890 bu. x $5.07 = $ ( 9,582)
(2) Production
(a) Seed = $ ( 3,000)
(b) Herbicide = $ ( 2,520)
(3) Insurance
(a) Federal Crop 375 acres x $5.80/acre = $ ( 2,175)
d. Total Subnet on Soybeans = 49,267
3. Oats (30 acres)
a. Anticipated yield = 80 bu./acre
30 acres x 80 bu./acre = 2400 bu.
b. Present Price = $0.98/bu.
2400 bu. x $0.98/bu. = $ 2,352
c. Expenses
(1) Production
(a) Seed = $ (363)
(b) Fertilizer = $ (490)
(c) Herbicide = $ (60)
Total Subnet on Oats = d. $ 1,439
*410 4. Total Subnet on Grains = $139,770
5. Other Income
a. 700 Feeder Pigs = 73,500
6. Total Subnet Farm Income = $213,270
7. Other Expenses
a. Fuel = $ ( 11,900)
b. LP for Grain Dryer = 5,000) $(
c. Repairs and Maintenance = 7,500) $(
d. Fertilizer for Set Aside = 395) $(
e. Alfalfa Seed = 768) $(
f. Feeder Pig Expenses = 61,250) $(
8. Total Net Farm Income = $126,457
II. CREDITOR CLAIMS
A. Parcel “A” (FLB Claim “F”)
FLB first mortgage in 240 acres
Loan balance = $ 343,252
Allowed secured claim
240 acres = $ 163,300[2]
Total unsecured claim = $ 179,952
1. Plan = issue a new note for the amount of the allowed secured claim with interest at 12.5% and principal payable annually based upon a 30 year amortization.[3]
The Ahlers’ yearly payments to the FLB on this secured claim would be $21,026 as compared to $27,252 under the present mortgage.
2. Norwest Bank has a second mortgage in this parcel of land, but no equity; it would receive nothing from this land under either reorganization or liquidation.
B. Parcel “B” (FLB claim “E”)
FLB first mortgage in 160 aeres
Loan balance = $ 160,668
Allowed secured claim
160 acres = $ 106,500
Total unsecured claim = $ 54,168
*411 1. Plan = issue a new note for the amount of the allowed secured claim with interest at 12.5% and principal payable annually based upon a 30-year amortization.
The Ahlers' yearly payments to FLB on this secured claim would be $13,713 as compared to $18,173 under the present mortgage.
2. Norwest Bank has a second mortgage in this parcel of land, but no equity; it would receive nothing from this land under either reorganization or liquidation.
C. Parcel “C” (FLB claim "G” — Norwest Claim “C”
FLB first mortgage in 80 acres
Norwest second mortgage in same
FLB loan balance = 5 30,184
Value of land = $ 62,480
Equity remaining for Norwest = 5 32,296
1. Plan for FLB = The Ahlers would affirm the original note and mortgage and would make payments pursuant to them. There is one principal and interest payment in default, and this payment, if it has not already been made, would be deferred to the end of the loan period.
Under this plan, the Ahlers’ yearly payments to the FLB would continue to be $2,849.25.
2. Plan for Norwest discussed supra in section F.
D. Parcel “D” (FLB Claim “D” — Norwest Claim “C”)
FLB first mortgage in 80 acres
Norwest second mortgage in same
FLB loan balance = $ 6,014
Value of land = $ 62,480
Equity remaining for Norwest = $ 56,466
1. Plan for FLB = The Ahlers would affirm the original note and mortgage and would make payments pursuant to them. There is no payment in default. Under the plan, the Ahlers’ yearly payments to the FLB would continue to be $855.
2. Plan for Norwest discussed supra in section F.
E. Summary of FLB claims
1. Loan balances
a. $343,252
b. $160,668
c. $ 30,184
d. $ 6,014
Total $ 540,118
2. Amount repaid under plan
a. $163,300
b. $106,500
c. $ 30,184
d. $ 6,014
Total $ 305,998
Total unsecured debt to FLB $ 234,120
*412 F. Norwest land claims
Allowed secured claims in land
1. Parcel A = $ 0
2. Parcel B = $ 0
3. Parcel C = $ 32,296
4. Parcel D = $ 56,466
Total $ 88,762
Plan = Norwest would retain a second mortgage in this land, and would be issued a new note for the amount of the allowed secured claim with 12.5% interest and principal payable annually based on a 30-year amortization.
Under this plan, yearly payments to Norwest on this secured claim would be $11,429.
G. Norwest machinery claim
Allowed secured claim of machinery and farm equipment based on estimate of Vander Grift which most closely reflects estimates of farm machinery “Bluebook” and “Iowa Hotline” auction guide = 66,300
Plan = Norwest would retain a lien on the machinery and would be issued a new note for the amount of the allowed secured claim with 10% interest and principal payable on a 6-year amortization.
Under the plan, the Ahlers’ yearly payments to Norwest on this allowed secured claim would be $15,241.
H. Summary of Norwest Bank claims
1. Loan balance = 450,468
2. Amount of secured claims repaid under the Plan:
a. Parcel C = 32,296
b. Parcel D = 56,466
c. 1984 crop proceeds = 43.000
d. Cattle proceeds = 12.000
e. Farm machinery = 66,300
Total = 210,062
Total unsecured debt to Norwest Bank = 240,406
I. John Deere Credit claim
Balance due on JD 7720 combine with corn and flax head = 35,791
Value/allowed secured claim = 26,000
Unsecured claim = 9,791
Plan = John Deere would retain a first lien on the combine and would be issued a new note for the amount of the allowed secured claim with 10% interest and principal payments based on a 6-year amortization.
Under this plan, the Ahlers’ yearly payments to John Deere Credit would be $5,977.
J. CCC Claim
Balance due on steel bin = 3,337
Value/allowed secured claim = 1,500
Unsecured claim = 1,837
Plan = CCC would retain a first lien in the steel bin and would be issued a new note for the amount of the allowed *413 secured claim with 10% interest and principal payments based on a 6-year amortization.
Under this plan, the Ahlers’ yearly payments to CCC would be $344.82.
GMAC Claim K.
L. Total Claims
Balance due on 1981 Pontiac Bonneville diesel automobile = 2,900
Plan = Ahlers would pay the full amount of the debt over three years at 10% interest.
Yearly payment to GMAC $1,169.
1. FLB = $540,118
a. Secured = 305,998
b. Unsecured = 234,120 $ 234,120
2. Norwest = $450,468
a. Secured = 210,062
b. Unsecured = 240,406 $ 240,406
3. John Deere = $ 35,791
a. Secured = 26,000
b. Unsecured = 9,791 $ 9,791
4. CCC = $ 3,337
a. secured = 1,500
b. Unsecured = ' 1,837 $ 1,837
5. GMAC = $ 2,900
a. Secured = 2,900
b. Unsecured = 0 $ 0
6. Total Debt with accumulated interest (approx.) = $ 1,040,000
7. Total secured claims paid under plan = $ 546,460
8. Total unsecured claims remaining = $ 493,540
III. LIQUID ASSETS
A. 1984 grain inventory = $ 43,000
Norwest has a first lien on this amount and this inventory would immediately be turned over to Norwest.
B. 1984 cattle sale = $ 12,000
Norwest has a first lien on this amount and these proceeds would immediately be turned over to Norwest.
C. 1985 grain inventory = $ 115,345
Approximately $57,000 will be needed to plant and harvest the 1986 crop. After the first year’s crop is harvested, the $115,345 would be subject to further order of the bankruptcy court.
IV. FUTURE OF PLAN
The Ahlers have approximately $37,854 per year extra which could be paid to unsecured creditor claims. Over the 30 years of the plan, this $37,854 would yield $1,135,620 exclusive of interest. After six years, Ahlers would have an additional $23,000 to be applied to the claims of the unsecured debtors ($493,540). If all payments were promptly made, these claims would be fully retired within 10.5 years.
Thus, under this plan, the secured creditors would be paid 100% of their allowed secured claims, with interest, and 100% of their unsecured claims, without interest, and the Ahlers would remain on their farm..
If liquidated, the creditors would receive *414 less than 100% of allowed secured claims (after exemptions were deducted), none of their unsecured claims, and the Ahlers would be deprived of the opportunity to work their farm,
V. BALANCE SHEET
Total Income
(Less Mary Ahlers’ income) = $ 126,457
A. Payments over 30 years
1. FLB land
Parcel A $21,026
Parcel B 13,713
Parcel C 2,849
Parcel D 855
$38,443 $ ( 38,443)
2. Norwest land
Parcels C & D = $11,429 $ ( 11,429)
Total land payments = $ ( 49,872)[4]
B. Payments over 6 years
1. Equipment
a. Norwest Equipment = $15,241
b. JD Credit = 5,977
c. CCC = 344
d. GMAC (3 years) = 1,169
C. Other payments $22,731 $ ( 22,731)
1. Living expenses = $14,000
(less Mary Ahlers’ $2,500 income) $ ( 11,500)
2. Tax and priority claims $ ( 4,500)
Total yearly expenses $ ( 88,603)
Total yearly net income $ 126,457
Available for distribution yearly to the unsecured creditors $ 37,854[5]

. When the deficiency and payment-in-kind (PIK) payments of the federal farm program are considered, the Ahlers can expect to receive approximately $3.50 per bushel for their corn in 1986. See K. Bailey, V. Byron, & J. Houck, The Food Security Act of 1985: Implications for Minnesota’s Farm Economy, University of Minnesota Department of Agriculture and Applied Economics Staff Paper 86-11 at 38 (March 1986). This $3.50 per bushel figure represents a deficiency payment of approximately $1.00 per bushel, a PIK payment of approximately $0.75 per bushel, and a projected market price of approximately $1.75 per bushel. Id. See also Interview with Al Kluis, Ag Marketing Services in Mankato, Minnesota at 4 (December 16, 1985). As the market price increases or decreases, the deficiency payment is adjusted accordingly; therefore $3.50 per bushel represents a fairly constant price for the 1986 corn crop.

. The values of land and equipment shown in this appendix were derived by this Court from the record presented to it and from published studies by the University of Minnesota for the sole purpose of making a determination as to whether it is reasonably probable that the Ah-lers can succeed. The bankruptcy court is free to determine values as of the date of confirmation on remand.

. The bankruptcy court is free to determine the appropriate interest rates and length of mortgage for the new mortgages on land and equipment from the record on remand. The rate should reflect that generally in use at the time the decision to approve or disapprove the plan is made. If the interest rate is less than that used in this appendix, the annual payments on the land would be reduced by about $2,300 for each percentage point decrease.

. These payments would be reduced by about $2,300 per year for each percentage point that the rate is reduced below 12.5%.

. This sum would be increased to $60,585 after the equipment restructured secured loans were paid off.